FILED
MAY - 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Otilio Carrasco,
Kelley Norman Joseph:Mala #0199509f
Metropolitan Detention Center    )
P.o. Box 2005
Cataño,Puerto Rico    )
#01995.094 USM
SS#580083514    )
    **Plaintiff/Complainant.** )

    vs.

SCOTT ANDERSON,AUSA.    )
HILLARY HODGE,Jr.
ICE/HIDTA OFFICER    )
ICE DEPARTMENT NISKY CENTER
ST.THOMAS,V.I. & H.I.D.T.A.    )
P.O. BOX 309480-VDS
ST.THOMAS,USVI.00803-9480,    )

JUAN CLEMENTE,    )
ANGEL NEGRON,
MELVIN FIGUEROA,    )
JOSE FIGUEROA,  ICE/MEO's
            OFFICERS    )
MIGUEL BERMUDEZ
JAHAIRA TORRENS,    )
U.S. ICE DEPARTMENT
CAPITOL BUILDING #800    )
PONCE DE LEON AVE,
12 Floor,SANTURCE,P.R.    )
    00908

U.S. CUSTOMS/BORDER PROTECTION    )
HOMELAND SECURITY DEPARTMENT
#1LA PUNTILLA STREET,FP&F    )
SAN JUAN,P.R. 00901    **Defendants.** )

CIVIL ACTION._____

**COMPLAINT**

*JURY ACTION*

Case: 1:07-cv-00873
Assigned To : Unassigned
Assign. Date : 5/9/2007
Description: Pro Se Gen. Civil

**STATEMENT OF FACTS IN SUPPORT
OF CLAIMS**

On August 11,2005 within the area of Culebra municipal waters of

Commonwealth of Puerto Rico, Plaintiff Kelley Mala, Propria Persona(hereinafter

Mala), and two other individuals Otilio Carrasco and Jahaira Cabrera, was seized,

assaulted,search of private and personal property and effects tresspass upon by name

Defendants, Juan Clemente,Commander Melvin Figueroa and others of Customs Border

Patrol Marina Enforcement unit,(hereinafter CBP/MEO's) by deadly force loaded weapon

drawn shot gun pointing at sea of Mala's 21"pleasure vessel" lawfully registered and

all in compliance with U.S.C.G. and Maritime safety regulation.

page 2. of 7.

2.   Defendants CBP/MEO's without any consent from Mala or anyone else aboard the vessel search into private and personal property, without any probable cause,without any plainview exception,without any exigent circumstances,without any warrant, seized Mala and others stated to have found contraband in personal property lock construction toolboxs and personal effects; before any allege contraband was found MEO's had already determine Mala and vessel was all in complience with law and Mala provided valid identification as lawful owner of pleasure boat. See attach Exhibit 1. page 19 to 20 Suppression hearing transcripts of December 8,2005 (Proof of Claim Defendants stated Mala was in complience with law).

3.   After Defendants CBP/MEO's seized Mala and others, arrested Mala and brought Mala to Customs Border Patrol Boathouse office, where Mala numerously requested to contact family and attorney;was refused by counterpart ICE Agents Angel Negron, Miguel Bermudez, Jahaire Torrens, and   was   held through the means of " INCOMMUNICADO"from an Arrest as of "COUP'd ETAL" style seizure,Mala was denied any communication with family or attorney, Mala family try to contact him through personal cell phone that was taken by Defendants and being used as in accepting Mala incomming calls from family but failure to inform or advised family Mala's  wife[1];that Mala was arrested.

    In return Mala was threaten,intimidated,and coerce to make a inculpatory confession in return for Defendant Hillary Hodge not to arrest Mala's mother or seize her property,Mala's business property, vechlies  e.c.t., Defendant Miguel Bermudez,Angel Negron,"RAIC" Jose Figueroa, all in effort with each other after Mala decline to make any state- ment or confession; contacted Hillary Hodge 'RAIC' in St.Thomas,Virgin Islands by cell phone interstate commerce from Puerto Rico to threaten and intimidate Mala over Defendants cell phone at Customs Boat office; Mala was put on the phone of Defendants where Hillary Hodge threaten Mala.

1.Footnote(Appendix Affidavit W.Todd )./ EXHIBIT 1. pages 233-236

page 3. of 7.

In effort to conseal such acts and action of Defendants Angel Negron,Miguel Bermudez, Jose Figueroa and Hillary Hodge of the threats and intimidation by cell phone communication, Defendants totally fail to make any reports or records of such procedures used or any contact with RAIC Hillary Hodge from St.Thomas, Virgin Islands division of ICE Department. See attach as Exhibit 1. pages 283-284 Proof of Claims.

4.  At all time Defendant Angel Negron the case Agent knowingly and intentionally goes before the U.S. District Court of Puerto Rico sworn under oath and submits and seeks for criminal complaint against Mala and Carrasco,used of false,involuntary confession of Mala  and  vitiated the magistrate judge Camielle Rive to find probable cause to detain Mala and Carrasco  as to an conspiracy charge and possession of controlled substances obtained from unlawful search and seizure  4th.Amendment violation.

Defendant Negron, submits fabricated information knowing was false and misrepresentation to the court in effort to deprive Mala of his 1st and 4th Amendment, liberty and property interest,false inprisonment,slander/defamatory of persona August 12,2005  acts of BARRATRY and Malfeasance.

On August 21,2005 again Defendant Negron a second time goes before the Court and Magistrate judge Rive with knowingly and intentional intent under oath and sworn testify blatantly perjury,fabrication and creating a false impression to vitiate the court find probable cause to allow the Government to seek Grand Jury Indictment against Mala and Carrasco; again on August 24,2005 Defendant Negron goes before an impanel Grand Jury proceedings and for the third time knowingly and intentionally under oath submits testimony as information and evidence use of perjury,fabrication and by means acts of barratry use of Mala's false/coerce  involuntary made confession duress, vitiates the Grand Jury panel through false impression, in returning an instrument of an allege indictment of charges 21 USC 841, 21 USC 846 and 18 USC 2.

U.S. v. Mala-Carrarso, Cr. No. 2005-286(JAF) D.C.P.R..

page 4. of 7.

Please take judicial notice at all time Attorney for the Government Scott Anderson AUSA and handler of Defendants as witnesses and presentation of testimony before the District Court, had never taken Oath of Office or Affirmation of Affidavit file within the District Court of Puerto Rico Clerk Office as in 28 CFR 0.151 making the complete proceedings **"void ab initio"** AUSA Scott Anderson was consider by law and Constitution, Rule 54 Fed.R.Crim.Proc. and Rule 6 (d)Fed.R.Crim.Proc as being an unauthorized person in the Grand Jury proceedings and unlawfully seeking without jurisdiction or authority to represent claims for United States of America corporation as in 28 USC 3002(1)(A) and (15)(A), creating the District Court of Puerto Rico without lawful jurisdiction Rule 12(c) Fed.R.Crim.Proc.; AUSA Scott Anderson never was issued an 6 digit Bar Number for District of Puerto Rico making his performance and presence within any proceedings against claimant Mala constitute to be impermissible application of Constitutional law and statue.

5.   In effort to conseal the unconstitutional acts against Mala, defendants knowingly and intentionally in violation of own duties and oath, removal of Mala's only eyewitness who was presence witness and was victim to the assault, false imprisonment, unlawful search and seizure, without any Court ORDER removal out the Country of Puerto Rico, to conseal her testimony in favor of Mala, violation of compulsory process obstruction of justice.(Mala witness was Jahaira Cabrera)

6.   In pretrial Defendant Negron case agent,  sworn affidavit for criminal complaint, states Mala and vessel was stop CBP/MEO's for rountine document check, August 11,2005 submitted to the Court August 12, 2005, on August 21,2005 in priliminary hearing under oath Defendant Negron affirm Mala and vessel was stop due to rountine document check by CBP/MEO's.

page 5. of 7.

On August 24,2005 Defendant Negron, reaffirms to the Grand Jury panel while Defendants
CBP/MEO's was conducting rountine patrol stop Mala and vessel conducted rountine
document check  and Mala consented verbally to a search of vessel.
Cn December 8,2005 all Defendants name conformed, that Mala and vessel was stop
for rountine document check and verbally consent to search. See Exhibit 1. page 20.

On December 19,2005 in Mala trial proceedings, Defendant Commander Melvin
Figueroa  and boarding Officer Juan Clemente CBP/MEO's  knowingly and intentionally
converts the stop of Mala vessel and search;by fabrication and of a false impression
before the Court and Trial jury  under oath; the stopping of Mala and vessel was
pursuant to Hot pursuit, Mala try to ellude authority., i.e. didn't want to stop
when CBP/MEO's hail to stop, Air Patrol,helicopter/Air Plane survillance from the
sky, prior information of boat going to be smuggling drugs and was out on back support
with other Agency Marine Patrol, was on duty and instruction to go down to Farjardo
from Old San Juan port to be back up.  See Exhibit 2. pages  10 thru et seq. **now-**
See as FOIA request for by Mala before trial October/November 2005 from CBP/MEO's
habor director Customs agency and see discovery as Exhibit 3. FOIA responce from
Washington D.C. Commissioner department over Puerto Rico  of Customs Border/Air Marine
no such, instruction was given,no such records, reports or information existence;
Defendants testimony on December 19,2005 totally acts of Barratry,Fabrication,
Manufacturing, Creating False Impression, Misconduct, Misrepresentation all before
the Court; depriving Mala and Carrasco of Liberty and Property  Interest through the
use of misconduct of perjury,slander,defamation of persona,causing false imprisonment
by use of unlawful search and seizure all in violation of Constitution,without Due-
Process and Equal Protection of Law all in violation Mala and Carrasco civil rights.

At all time Mala and Carrasco has seek Subpoena Duces Tecum Defendants Negative
Averment, fail to responce or provide such information,records,reports non-existence;

page 6. of 7.

At all time Mala and Carrasco has seek and requested from Clerk Office certificate copy of file Oath of Office and Affirmation Affidavit, Subpoena Duces Tecum,non - responce Negative Averment. See as Exhibit 4.  Certified Mail received.

At all time Mala has requested for AUSA Scott Anderson appointment Oath of Office from U.S. Department of Justice Washington D.C.  Executive  Office U.S.Attorneys Request Number 06-3253 Requester Kelley Mala from October 23,2006 (Oath of Office Puerto Rico District) Negative Averment, Mala parents Mother has personal call and requested and follow up on such request of AUSA Scott Anderson Oath of Office non- responce.  See as Exhibit 5. Request by Mala to Executive Office Washington D.C.

At all time Mala resubmited to the District Court of Puerto Rico for Defendants and AUSA Scott Anderson responce to Proof of Claims of any Superior Claims over Mala's  liberty and Property Interest, Proof of Claim Mala voluntarily consent to any search, Court  Order to responce within 15 days, it has been over 2 months Negative Averment;construte as contempt of Court Order. See Exhibit 6. District Court docket report represents such order and Mala claims.,docket # 222 and 223.

In light of all claims of Mala in support, prior to any pretrial hearings, Mala voluntarily with consent taken polygraph  examination that established:

A.    Mala totally innocent;

B.    Mala never given verbal consent or subjected to any search voluntarily and the stop of Mala and vessel by Defendants CBP/MEO's on August 11,2005 4:15 p.m around the waters of Culebra was by gun point,an aggressive take over,form of Piracy,tresspass,invasion of privacy and private property, assault;

C.    Unknown any controlled substance was in private property others personal effects lock toolboxes and construction tools;

D.    No agreement or not being paid to transport any contraband;

E.    And that Mala  made false statement as in confession through means of threats,coercion,intimidation and procurance by Defendants.

See Exhibit 7. (Polygraph Examination Certified very Credible Examiner of Puerto Rico Forensic Professioner, as results being accurate true and correct).

**At all time Defendants was all Acting Under the Color of Law and Duties with each other knowingly and intentionally and intent to violate Mala and Carrasco of rights as in Liberty and Property Interest.**
**Mala at all time has file grievance complaint exhausted all administrative remedy,no avail .File On or about October 2005.**

**Defendants acts and action violated Admiralty/Maritime laws Piracy.**

page 7 of 7.

**CONCLUSION:**

WHEREFORE   Complainant Kelley Mala seeking the following relief as stated:

(i). Trial By Jury if necessary as in the misconduct and violation to Mala and Carrasco civil rights violation by Defendants;

(ii). Just compensation for injuries and damages lost of profit and businesses;

(iii).  Expedited review process and summons with relief of Habeas Corpus release from unlawful incarceration;

(iv). Return of personal private property Proline 21" Pleasure Boat taken unlawfully without Due-Process and $1,500 U.S. currency taken from Mala personal proeprty never reported by Defendants and Religous garment taken religous belt as of Mala's religous faith.

Submitted Respectfully This day March 15,2007 A.D.

Without Prejudice

Kelley Mala, Propria Persona
Individual Capacity Natural Person
Invoking Unlimited Commercial
Liability.

Each and Every Claim Kelley Mala has raise or Stated in this complaint is true,accurate,correct and given to the best of my Knowledge on this day 15,of March 2007 A.D. So Help Me GOD sworn under the penalty of perjury 28 USC 1746 and sayth seal:

**Attach Affidavit In Support.**

Witness

Without prejudice

Natalia M.Laborde Case Manager

Kelley Norman Joseph Mala
Propria Persona/Affiant

NAME                    TITLE
AUTHORIZED BY THE ACT OF JULY 7, 1955,
AS AMENDED, TO ADMINISTER OATHS (18 USC 10041

# A F F I D A V I T

I Kelley Norman Joseph: Mala , on this day 15,of March 2007 A.D. states the following is true and correct and given under the penalty of perjury sworn to So Help Me GOD:

1. On August 11,2005 on or about 4:15 p.m. I was seized by gun point from Officers of Customs Border Patrol Marine Division in the area of Culebra  waters of municipal Commonwealth of Puerto Rico.

2.  At no time I or anyone else aboard my pleasure craft had time or any rights to grant or given consent to a voluntary search, all action and procedures was by gun point without any private personal rights to my property, the Marine Officers Juan Clemente and Anthony Romenillo by weapon drawn shot gun pointing boarded my vessel knowing that Mala vessel had already provided valid Identification by force under gun point and provided valid registration of vessel all in complience with Admiralty/Maritime regulation of U.S.C.G. and DPNR having all safety equipment;

While Officer Romenillo held Carrasco at gun point to his body, I was held gun point by Clemente and the Officers rummage through my pleasure vessel without any consent and through personal effects and lock container Contruction toolboxes then stated they found contraband every one under arrest.

3. By the aggressive acts and action of Officer Clemente and Romenillo and others action, made Jahaire Cabrera female companion urinated herself and went into mental shock.

4. Mala at all time requested to use my cell phone to contact family and to contact Attorney of my arrest and the impermissible acts of the Marine Officers, I was totally denied such request or Constitutional rights, I was also denied assisting or comforting female companion as to her condition of mental stress reaction in shock.

5.  I was taken to land and detained from 5:00 P.m. to 1:00 A.M. at Customs Border Marine Officers Boathouse Office, where we all was by means of threats,coercion, intimidation and duress precured to make involuntary confession that was false by assistance and guidence of ICE Agents Miguel Bermudez and Jahaire Torrens, Angel Negron, RAIC Jose Figueroa and others.

07 0873
FILED
MAY - 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

page 2 of 2.

6. When I decline to make any statement and remain silence, I was taken outside the Customs Border Officer Boathouse Office to a garage where I was put on a cell phone by Miguel Bermudez, Angel Negron and RAIC Jose Figueroa was presence to talk with St.Thomas, Virgin Islands RAIC  Hillary Hodge Jr of the ICE Department; where he threaten me that if I don't assist and give the ICE Agents in Puerto Rico state-ment  and corporate, he will make sure;that he seize my business,arrest my mother becuase her address of residence was on my boat registration and charge her with being part of conspiracy and seized her property that was on my boat registration, and he Hillary Hodge would make sure I receive 20 years to life and I would never see my kids or enjoy freedom with them and further inform me I would never get to enjoy benifit from civil lawsuit settlement, he would make sure I don't see the streets again. e.c.t. I reported such acts to the Court.

7. Also my witness and companion Jahaire Cabrera, due to her eyewitness and traumatize by the Officers assault and agressive action, Mr. Cabrera was removal out the case and country less than 12 hours after arrest to conseal the unlawful acts, no judge or Court Order the Officers provided an documents stateing she was voluntary re-moval out the country.

8. At all time when stop,seized and search unlawful no Airplane/Helicopter or hot pursuit never taken place and I at no time fail to stop when hail to by CBP/MEO's, at no time I attempt to ellude the Custom Border Patrol Marine vessel, its very impossible for me being in a single engine pleasure craft 200 hp, 21 feet, when Customs Border vessel has (Four  225 Hp. 38 foot power vessel  making total of 900 Hp.) could never outrun such power boat.

    The name Defendants all acting with each other knowingly and intentionally violate my rights to liberty and property while acting under the color of law.

    Each and Every claim I have stated is true and correct reaffirm under the penalty of perjury: 28 U.S.C. 1746.

Sayth Witness and Seal

Without prejudice
March 15,2007

Natalia Laborde Case Manager
NAME           TITLE
AUTHORIZED BY THE ACT OF JULY 7, 1955,
AS AMENDED, TO ADMINISTER OATHS (18 USC

EXHIBIT 1

```
 1                      E X H I B I T
 2
 3     IN THE UNITED STATES DISTRICT COURT
 4          FOR THE DISTRICT OF PUERTO RICO
 5  UNITED STATES OF AMERICA,    *  CR. 05-286(JAF)
 6          Plaintiff,           *
 7       vs.                     * San Juan, Puerto Rico
    OTILIO CARRASCO,             *
 8  aka BENITO SANTIAGO DE LA    * 08 December 2005
    ROSA, and KELLY MALA,        *
 9                               * 9:30 a.m.
          Defendants.            *
10
11              SUPPRESSION HEARING
12
13     BEFORE THE HONORABLE JOSE A. FUSTE
        UNITED STATES DISTRICT COURT CHIEF JUDGE
14
    APPEARANCES
15
    COUNSEL FOR THE GOVERNMENT
16  SCOTT ANDERSON, AUSA
17
    COUNSEL FOR THE DEFENDANTS
18  ANITA HILL, ESQ.
    FRANCISCO VALCARCEL FUSTE, AFPD
19     VAZQUEZ, AFPD
```

**COPY**

```
             YVETTE RICHARDSON, CSR OCR
                  (787) 772-3476
```

---

|  | | I N D E X O F E X A M I N A T I O N | | | |
|---|---|---|---|---|---|
| WITNESS | | D | X | RD | RX |
| **For the Government:** | | | | | |
| JUAN CLEMENTE | | | | | |
| By Mr. Anderson | | 8 | -- | -- | -- |
| By Ms. Hill | | -- | 18 | -- | 36 |
| By Mr. Valcarcel | | -- | -- | 26 | -- |
| ANTHONY ROMANIELLO | | | | | |
| By Mr. Anderson | | 39 | -- | -- | -- |
| By Ms. Hill | | -- | -- | -- | -- |
| By Mr. Valcarcel | | -- | 45 | -- | -- |
| ANGEL NEGRON | | | | | |
| By Mr. Anderson | | 51 | -- | -- | -- |
| By Ms. Hill | | -- | 57 | -- | -- |
| By Mr. Valcarcel | | -- | -- | 76 | -- |
| JOSE FIGUEROA | | | | | |
| By Mr. Anderson | | 81 | -- | -- | 93 |
| By Ms. Hill | | -- | 87 | -- | -- |
| By Mr. Valcarcel | | -- | -- | 87 | -- |
| MIGUEL BERMUDEZ | | | | | |
| By Mr. Anderson | | 94 | -- | 157 | -- |
| By Ms. Hill | | -- | 109 | -- | -- |
| By Mr. Valcarcel | | -- | 144 | -- | -- |
| JAHAIRA TORRENS | | | | | |
| By Mr. Anderson | | 162 | -- | -- | -- |
| By Ms. Hill | | -- | 168 | -- | 193 |
| By Mr. Valcarcel | | -- | -- | 181 | -- |
| ELUTHERE MALA | | | | | |
| By Ms. Hill | | 198 | -- | -- | -- |
| By Mr. Anderson | | -- | 200 | -- | -- |
| By Mr. Valcarcel | | -- | -- | -- | -- |
| KELLY MALA | | | | | |
| By Ms. Hill | | 201 | -- | -- | -- |
| By Mr. Anderson | | -- | 257 | -- | -- |
| By Mr. Valcarcel | | -- | -- | -- | -- |

---

```
                   E X H I B I T S
```

| Exhibit | Iden. | Evid. |
|---|---|---|
| **For the Government** | | |
| 1 | 54 | 54 |
| 2 | 97 | 97 |
| 3 | 101 | 101 |
| 4 | 103 | 103 |
| 5 | 170 | 170 |
| **For the Defendant** | | |
| 1 | 60 | 60 |
| 2 | 67 | 67 |
| 3 | 207 | 207 |
| 4 | 215 | 215 |
| 5 | 248 | 248 |
| 6 | 248 | 248 |

**07 0873**

**FILED**

MAY - 9 2007

---

```
                                              4
                P R O C E E D I N G S
     (Whereupon, the following proceedings were
    had in open court in the presence of the
    jury:)
         THE COURT:  With that, let's call the case.
         THE CLERK:  Criminal case 05-286.  United
    States of America versus defendant Number 1, Otilio
    Carrasco and defendant number 2, Kelly Mala for
    suppression hearing.  Will counsel please come forward
    and identify yourself for the record.
         MS. HILL:  Anita Hill on behalf of Kelly
    Mala.
         MR. VALCARCEL:  Francisco Valcarcel from the
    Federal Public Defender's on behalf of Otilio
    Carrasco.  Nevertheless, before we get to the matter
    at hand we would like to request five minutes to state
    something on the record.
         THE CLERK:  Both defendants are present in
    Court and they are both being assisted by the official
    Court's interpreter.
         MR. ANDERSON:  Scott Anderson, United States
    Attorney's office, ready to proceed, Your Honor.
         THE COURT:  What is the situation?
         MR. VALCARCEL:  Your Honor -- yes, Judge.  As
    Your Honor is aware, there were some issues that came
             YVETTE RICHARDSON, CSR, OCR
```

EXHIBIT C

**9**

MS. HILL: Right.

THE COURT: Unless Mr. Anderson wants to cross-examine him on that issue.

MR. ANDERSON: Your Honor, I don't believe it is an issue at the hearing.

THE COURT: So let's not excuse him then.

MS. HILL: Can I have him sit in the courtroom?

THE COURT: I would rather have him excused too.

Very well.

Go ahead.

MR. ANDERSON: Thank you.

BY MR. ANDERSON:

Q    Sir, can you please state your name for the record?

A    Juan Clemente.

Q    And by whom are you employed?

A    U.S. Customs and Border Protection.

Q    In what capacity?

A    As a marine enforcement officer.

Q    I'm going to direct your attention to August 11, 2005. Were you involved in the interception of a vessel near Culebra, Puerto Rico?

A    Yes, that's correct.

YVETTE RICHARDSON, CSR, OCR

**10**

JUAN CLEMENTE - DIRECT - ANDERSON

Q    And who else were you with when you made this interception?

A    Three more officers. Officer Antonio Romaniello. Officer Jason Vela and Officer Melvin Figueroa.

Q    And what type of vessel did you intercept?

A    It was a like a 21-foot vessel with outboard engines.

Q    And why did you intercept this vessel?

A    We stopped the vessel because we wanted to conduct a document check on the vessel and the individuals.

Q    And did you, in fact, conduct that document check?

A    That's correct, sir.

Q    Approximately --

THE COURT: What time of the day was this?

THE WITNESS: Excuse me?

THE COURT: What time of the day was this?

THE WITNESS: It was about 4:15 in the afternoon, sir.

THE COURT: Okay.

BY MR. ANDERSON:

Q    And when you intercepted this vessel, who was operating the vessel?

YVETTE RICHARDSON, CSR, OCR

**11**

JUAN CLEMENTE - DIRECT - ANDERSON

A    Officer Melvin Figueroa.

Q    That was your vessel, correct?

A    Yes, sir.

Q    Who was operating the vessel that you intercepted?

A    Mr. Kelly Mala, sir.

Q    And do you see Mr. Kelly Mala in Court today?

THE DEFENDANT: Yes, sir.

THE COURT: Can you please point to him and describe what he is wearing.

A    He is wearing the tan dress and long hair.

MR. ANDERSON: Indicating the defendant, Mr. Mala.

THE COURT: Very well.

BY MR. ANDERSON:

Q    And when you did this document check were you able to ascertain who owned this vessel.

A    Yes, sir.

Q    Who owned the vessel?

A    Mr. Kelly Mala.

Q    So what happened when you intercepted this vessel?

A    We requested I.D. cards to identify the persons on Board. Mr. Kelly Mala, he provided his birth certificate. Then we asked a couple of

YVETTE RICHA   , CSR, OCR

**12**

JUAN CLEMENTE - DIRECT - ANDERSON

questions like where were you coming from. He stated that he came from Culebra and then what was the purpose of him being, you know, heading to Puerto Rico and he stated he was going to buy tools in Home Depot in Puerto Rico.

Q    Now, was Mr. Mala alone in this vessel?

A    No. It was with two other subjects.

Q    Do you remember their names?

A    Yes, sir.

Q    What were their names?

A    Otilio Carrasco and Yahira Pinales Cabrera.

Q    Do you see any of those individuals in Court today?

A    Yes, I see Mr. Otilio Carrasco.

Q    Can you please point to him and describe something he is wearing?

A    Sitting here wearing the tan dress and baldhead.

MR. ANDERSON: Indicating the defendant Mr. Carrasco.

BY MR. ANDERSON:

Q    And what about Yahira Cabrera, do you see her in Court?

A    No, sir.

Q    Did you actually board this vessel that you

YVETTE RICHARDSON, CSR, OCR

17

JUAN CLEMENTE - DIRECT - ANDERSON

1    Q    What did you do with the three individuals,
2  the vessel and the narcotics at that point?
3    A    Well, the three individuals were -- We put
4  them on our boat and then we transported the vessel,
5  the suspect vessel, our vessel and the suspects to
6  Ceiba, Puerto Rico where we have the office.
7    Q    Beside the backpack did you find any other
8  narcotics on the boat?
9    A    Yes, sir.
10    Q    Where?
11    A    It was on the stern of the boat in two
12  toolboxes and under the helm housing in a shoe box
13  were a regular pack which I think it came out of -- It
14  was field tested, it was heroin.  Irregular type shape
15  of package.
16    THE COURT:  Inside the shoe box.
17    THE WITNESS:  Excuse me, sir.
18    THE COURT:  It was -- was it inside a shoe
19  box?
20    THE WITNESS:  Inside a shoe box.
21  BY MR. ANDERSON:
22    Q    And where was this shoe box recovered from?
23    A    Under the helm housing under the steering
24  wheel of the boat.
25    Q    What did you do with the three individuals
                    YVETTE RICHARDSON, CSR, OCR

18

JUAN CLEMENTE - DIRECT - ANDERSON

1  once you returned to the Farjado area?
2    A    They were turned over to the ICE agents.
3    Q    And at that point did that end your
4  interaction with the three individuals?
5    A    At that point everything ends.  I did not
6  continue asking questions to any of those individuals.
7  I just helped in some other duties.
8    MR. ANDERSON:  Thank you.  Did Mr. Carrasco
9  ever ask to speak to a lawyer.
10    A    No, sir.
11    Q    Did he ever ask to speak to anyone?
12    A    Not during our trip from our journey from the
13  point where we stopped them to where -- when we got to
14  the marina.
15    MR. ANDERSON:  Thank you.  No further
16  questions of this witness.
17    CROSS-EXAMINATION
18  BY MS. HILL:
19    Q    You will agree with me that at 1600 hours on
20  the 11th of August you were conducting a routine
21  patrol in the vicinity of Cayo Lobo Culebra.
22    A    That's correct.
23    Q    And observed a 21-footer boat center consoled
24  with a 200 horsepower single engine?
25    A    That is correct.
                    YVETTE RICHARDSON, CSR, OCR

19

JUAN CLEMENTE - CROSS - HILL

1    Q    And once you approached it you noticed that
2  this was an American flag vessel and you later found
3  out it was registered in the Virgin Islands?
4    A    Um-hum.
5    Q    Yes or no?
6    A    That is correct.
7    Q    And you will also agree with me that the
8  description and the boat itself once you approached it
9  did not match the characteristics or the typical
10  characteristics of what is known as smuggling boats?
11    A    That is correct.
12    Q    And as a matter of fact this boat only had
13  one single 200 horsepower engine?
14    THE COURT:  Was it one engine or two engines.
15  BY MS. HILL:
16    Q    Do you have your launch report with you?
17    A    I am not sure, but I think it is a single
18  engine.
19    Q    If I show you your launch report will that
20  refresh your memory?  So your answer is?
21    A    One single outboard engine.
22    Q    200 horsepower?
23    A    That's correct.
24    Q    And is it not correct that Mr. Mala provided
25  you with a valid certificate of boat registration?
                    YVETTE RICHARDSON, CSR, OCR

20

JUAN CLEMENTE - CROSS - HILL

1    A    That's correct.
2    Q    So I don't need to show it to you.
3         Is it also a fact that in this case you had
4  no prior intelligence or confidential information
5  regarding this vessel as one being involved in
6  narcotics smuggling?
7    A    That's correct.
8    Q    So it was just a routine patrol?
9    A    A routine patrol.
10    Q    Upon interception you conducted a document
11  check of the occupants and the vessel?
12    A    That's correct.
13    Q    And you found that not only the vessel, but
14  Mr. Kelly Mala had all his documents in order in
15  compliance with the law.
16    A    That's correct.
17    Q    And you asked Mr. Mala about the purpose of
18  his trip?
19    A    That's correct.
20    Q    And you testified a few minutes ago that
21  Mr. Mala told you that he was coming to buy some tools
22  at Home Depot?
23    A    That's correct.
24    Q    That was your testimony?
25    A    Yes.
                    YVETTE RICHARDSON, CSR, OCR

29

1  he was pointing the weapon or not.

2      Q    Is it your testimony that you don't know when

3  a weapon is being trained in a situation like this?

4      A    Can you repeat the question again.

5      Q    Fine.

6          Is it your testimony, sir, that you do not

7  know where a weapon is being trained or aimed at in a

8  situation like this?

9      A    At that point -- At that moment if the weapon

10 was pointed at the persons onboard, I did not know

11 because I was in front, like I say, the guy was behind

12 me and the other two persons were onboard the motor

13 vessel. I am not looking at him. I am looking at the

14 persons I am asking questions.

15     Q    What was the name of the person you just

16 referred to as the guy, the other officer?

17     A    Officer Romaniello, which was the person that

18 went onboard with me.

19     Q    Okay.

20          Now, do you recall what commands you shouted,

21 if any?

22     A    I just asked for I.D. cards.

23     Q    What was your tone of voice, sir?

24     A    The same one I'm using here. Let me see your

25 I.D. cards.

                YVETTE RICHARDSON, CSR, OCR

---

JUAN CLEMENTE - CROSS - VALCARCEL
30

1      Q    So it is your testimony under oath that no

2  yelling or loud voices were used?

3      A    Maybe it was used prior to going onboard

4  because Mr. Mala didn't want to stop the vessel.

5      Q    Okay. And what was yelled at the beginning?

6      A    Stop the vessel.

7      Q    Nothing else was asked of the people on the

8  vessel?

9      A    Just stop the vessel.

10     Q    Okay?

11     A    That I remember.

12     Q    Now, it was your testimony, was it not, that

13 this was to be a routine document check, correct?

14     A    Yes, sir.

15     Q    It was also your testimony on direct that

16 there was no tip or confidential information that

17 pointed to this vessel carrying drugs; is that

18 correct?

19     A    That's correct.

20     Q    Is it routine to draw weapons on passengers

21 in a routine document check?

22     A    Depending upon the situation.

23     Q    So why in this situation did you gentlemen do

24 that, sir?

25     A    Because they didn't want to stop at the time

                YVETTE RICHARDSON, CSR, OCR

---

JUAN CLEMENTE - CROSS - VALCARCEL
31

1  we tell them to stop, like several occasions, and they

2  didn't stop. They started going around in circles,

3  around our boat and we told them to stop the vessel.

4      Q    How long did it take them to stop?

5      A    Maybe two to five minutes.

6      Q    Okay.

7          Sir, isn't it sometimes common to have

8  vessels go in circles when they want to slow down?

9      A    I don't recall that practice.

10     Q    Okay.

11         Now, you said that you went onto the vessel.

12 Now, you asked some routine questions and it was your

13 testimony that you didn't see anything out of place.

14 Is this correct?

15     A    That is correct.

16     Q    So you mentioned in your direct testimony

17 that you started searching the bow and you found

18 nothing there; is that correct?

19     A    That's correct.

20     Q    And did you see anything else in the bow that

21 led you to believe that this vessel was carrying

22 contraband?

23     A    Not at the bow.

24     Q    Did you see anything at all on the surface of

25 the boat that would lead     ou believe this boat was

                YVETTE RICHA.  .ON, CSR, OCR

---

JUAN CLEMENTE - CROSS - VALCARCEL
32

1  carrying on the deck of the boat -- Excuse me, that

2  would lead you to believe that this vessel was

3  carrying contraband?

4      A    Not at that time. I just saw the toolbox and

5  everything else in the back. But I just did the

6  routine check.

7      Q    Okay. Let me ask you, are you aware, sir,

8  that other maritime enforcement agencies have video

9  cameras on their boats?

10         MR. ANDERSON: Objection, relevance.

11         THE COURT: Well, did you have a camera on

12 this boat.

13         THE WITNESS: No, sir.

14 BY MR. VALCARCEL:

15     Q    Okay.

16         Now, sir, you mentioned you tried to obtain

17 verbal consent?

18     A    That's correct.

19     Q    You didn't have anything that you could take

20 written consent down from Mr. Mala that you could

21 search the boat?

22     A    No, sir.

23     Q    Is it your testimony that customs and border

24 protection agencies do not use such forms?

25         MR.   .RSON: Objection.

                .TE RICHARDSON, CSR, OCR

49

1  herself?

2      A    No.

3      Q    Did -- is it your testimony, sir, that at no

4  point in time you were trained or had the weapon close

5  to Mr. Carrasco?

6          MR. ANDERSON:  Objection.  He has covered

7  this area.

8          THE COURT:  I think so.  We have.

9          MR. VALCARCEL:  Judge, if I might ask this

10  question, I think it took us a while to get to the

11  fact that the weapon was in a ready position.

12          THE COURT:  Perhaps I can ask the question.

13  If you are in this kind of situation, you are there to

14  make sure that the guys know if you have to use it you

15  would.

16          THE WITNESS:  Yes.

17          THE COURT:  That is the what you do in that

18  type of scenario.

19          THE WITNESS:  You never know what somebody is

20  going to do when they are moving drugs.

21          THE COURT:  That is it.

22  BY MR. VALCARCEL:

23      Q    So you boarding the boat in an intimidating

24  manner --

25      A    I didn't say that.

              YVETTE RICHARDSON, CSR, OCR

---

50

1          THE COURT:  I think the question was answered

2  correctly.  And I don't think there is any issue about

3  that.  You cannot expect the agents to say, Mr. Mala,

4  do you mind if I keep this shotgun here.  I'm not

5  really intimidating you.  That is not the way it

6  works, Counsel.  There is no jury here.  You should

7  assume if I were the officer I would have done it

8  exactly the same way.

9          MR. VALCARCEL:  I am just asking for

10  specificity of the posture of their body language.

11          THE COURT:  I'm assuming that they

12  are -- They have their weapons and the weapons are

13  there to make certain there is no mistake about the

14  fact of who is in charge of the scene, whatever it

15  takes.  That is a fact.  You would do it the same way

16  if you were there, Counsel.  Please.

17          MR. VALCARCEL:  Was anything done to describe

18  his body posture.

19          THE COURT:  It doesn't really matter about

20  his body posture.  He is there and you are there and

21  his clients know there is an officer, he has a

22  shotgun, he has a sidearm and he is in control.  It is

23  as simple as that.

24  BY MS. HILL:

25      Q    Sir, is it your testimony that the crossing

              YVETTE RICHARDSON, CSR, OCR

---

51

1  from the United States Virgin Islands from Culebra or

2  Farjado is a border crossing?

3      A    It wouldn't necessarily be a border crossing.

4  I can't be sure where they were when they left, if

5  they crossed the three-mile border or not cross the

6  three-mile border.  They were in Customs waters at the

7  time of the stop.

8      Q    So your testimony is this was not a border

9  search?

10      A    No.  It was a document check.

11          THE COURT:  Very well.

12          Anything else?  You are now excused.  Call

13  your next witness.

14          MR. ANDERSON:  The government calls Angel

15  Negron.

16          ANGEL NEGRON,

17  was called as a witness, and after having been duly

18  sworn, was examined and, testified as follows:

19          DIRECT EXAMINATION

20  BY MR. ANDERSON:

21      Q    Agent, can you state your full name and the

22  agency you are employed by?

23      A    My name is Special Agent Angel Negron.  I work

24  for the United States Immigration and Customs

25  Enforcement.

              YVETTE RICHARDSON, CSR, OCR

---

52

1      Q    Were you involved in the investigation

2  regarding a Kelly Mala and Otilio Carrasco.

3      A    Yes, sir.

4      Q    At what point did you become involved in this

5  investigation?

6      A    I was on duty that week and I received a call

7  from the marine enforcement officer that they have

8  three arrestees, that they arrested at sea near

9  Culebra, Puerto Rico and I waited for them at the

10  boathouse in Ceiba.

11      Q    Did you arrive at the boathouse before or

12  after the defendants arrived?

13      A    Before.

14      Q    And what happened when the defendants arrived

15  at the boathouse, where you were located?

16      A    When they got to Ceiba we took custody of the

17  three arrestees.  We escorted them from the ramp of

18  the boat where they park the boats.  And we

19  transported them to the office of the boathouse where

20  the MEO's are located.

21      Q    Agent, do you know what a religious belt is?

22      A    No, sir.

23      Q    Did you at any time receive any kind of belt

24  from either defendant?

25      A    No, sir.

              YVETTE RICHARDSON, CSR, OCR

On the records here if it doesn't make it ...    281

1  is the circumstances and the fact that it was
2  adjudicated in the case it doesn't say so, due to
3  ineffectiveness of counsel at trial and I was not
4  exonerated of my rights.
5      Q    Everything that happened to you in that case
6  and this case is someone else's fault, isn't that a
7  fact?
8      A    The facts are on the record, I'm telling you.
9      MR. ANDERSON:  No further questions.
10     THE COURT:  Anything else?  Thank you very
11 much.
12     Any additional questions?
13     Thank you very much.  You are now excused,
14 Mr. Mala.  You can go back to your chair.
15     Mr. Valcarcel, any evidence?
16     MR. VALCARCEL:  Not from our part, Your
17 Honor.
18     THE COURT:  Very well.
19     MS. HILL:  Your Honor, we had filed and we
20 had included, even though I know it is not admissible,
21 we had included a polygraph.
22     THE COURT:  Yes, but that is --
23     I've seen polygraphs of all kinds and I don't
24 have the slightest trust in those.
25
         YVETTE RICHARDSON, CSR, OCR

---

KELLY MALA - CROSS - ANDERSON    282

1  here.  Mr. Anderson, who is this Mr. Hodge?
2      MR. ANDERSON:  Mr. Hodge is an agent who is
3  stationed in the United States Virgin islands.
4      THE COURT:  And is it true -- Have you talked
5  to him.
6      MR. ANDERSON:  Yes.
7      THE COURT:  Is it true that he was on the
8  phone with this man?  How did that come about?
9      MR. ANDERSON:  As Agent Bermudez already
10 testified, when these individuals are taken into
11 custody and they find out they are in the Virgin
12 islands, I believe there was a call from agents here
13 to the Virgin Islands to find out whether Kelly Mala
14 or Otilio Carrasco was known to anybody, which is
15 standard investigative procedure and at that point
16 Mr. Hodge became aware of the fact that he had
17 Mr. Mala in custody.  And --
18     THE COURT:  And is it true that Mr. Hodge
19 talked to the defendant on the phone?
20     MR. ANDERSON:  Yes.
21     THE COURT:  And is it true that he urged him
22 to cooperate.
23     MR. ANDERSON:  What he said to Mr. Mala was
24 listen, we know what you are telling the agents is not
25
         YVETTE RICHARDSON, CSR, OCR

---

KELLY MALA - CROSS - ANDERSON    283

1  true.  We know -- so he started saying we know where
2  you park your boats.  We know about your boat
3  accident.  He started laying out different things for
4  Mr. Mala, letting him know, Mr. Mala, we know more
5  about you than you think we know about you.  If you
6  are going to cooperate, this is the time to cooperate.
7  He in no way threatened.
8      THE COURT:  Let me ask you something, is
9  there any official document in that record that
10 documents that call?
11     MR. ANDERSON:  No.
12     THE COURT:  Don't you find that a bit unusual
13 to say the least that a defendant is asked, passed the
14 phone to talk to an agent from another jurisdiction
15 and the agent then tells him all these things that you
16 are telling me that he told him.  Don't you think that
17 is a bit unusual, to say the least.
18     MR. ANDERSON:  I don't know if it is unusual.
19 I mean, we have agents who are conducting an
20 investigation.  And if they are going to have
21 information to use in an investigation, then it would
22 be no different than if Mr. Hodge happened to be in
23 Puerto Rico, and they called him to show up and talk
24 to the defendant.  Why would it be any more unusual
25 than that?
         YVETTE RICHARDSON, CSR, OCR

---

KELLY MALA - CROSS - ANDERSON    284

1      THE COURT:  True, there is no documentation
2  of the conversation.  Nobody else was listening to
3  this conversation, it was only between Mr. Hodge and
4  the defendant.  Don't you think that is a bit unusual
5  especially when there is no documentation of the
6  conversation?
7      MR. ANDERSON:  Unusual in the fact that no
8  one else was listening.  Maybe that is unusual.  But
9  the fact that he spoke to the defendant I don't find
10 that unusual.
11     THE COURT:  Very well.  Would it be fair to
12 say that those phone records confirm the fact that
13 somebody answered the phone.
14     MR. ANDERSON:  Someone answered the phone.
15 No.
16     THE COURT:  How could you explain that there
17 are one minute and two minute charges.
18     MR. ANDERSON:  Well, a one minute charge in
19 the cell phone records don't always charge to the
20 minute.  A minute for a phone call would be less than
21 a minute, but.
22     THE COURT:  But you also know when you have a
23 cell phone and you don't answer the phone.
24     MR. ANDERSON:  What if you answer the phone
25 and it is a voice mail.
         YVETTE RICHARDSON, CSR, OCR

285

1      THE COURT: It is a possibility.

2      MS. HILL: Not the two-minute calls, Your

3 Honor.

4      THE COURT: What about the note that was sent

5 over from the Kelly Mala side to the Carrasco side.

6 What do you think of that note? What was the law

7 enforcement purpose of that note, passing that note

8 along to someone else?

9      MR. ANDERSON: Mr. Mala was confessing to his

10 participation in this crime and he desperately wanted

11 to somehow confront Otilio Carrasco to make sure

12 Otilio Carrasco was confessing his participation and

13 the agent said we are not putting you two together and

14 the agents explained to me why they don't do that.

15      THE COURT: Is that cooperation or what is

16 it. How do you describe Mala's insistence to the

17 agents in convincing Carrasco to confess, what is it?

18      MR. ANDERSON: I don't believe it was

19 cooperation. Write this letter to Otilio to say.

20 Write this piece of paper and we will bring it to him

21 and give it to him but we are not putting you two

22 together.

23      THE COURT: But do the papers correspond to

24 the statements that Mala made to the agents. The

25 version, the facts that appear in the note, do they

YVETTE RICHARDSON, CSR, OCR

286

1 correspond to any text of the confession.

2      MR. ANDERSON: I don't believe. So they are

3 just telling Carrasco the police want to know what

4 happened. Tell them. It doesn't mention his

5 confession that he gave to the agents.

6      THE COURT: This is what we are going to

7 here. And I think by doing this I am going to do a

8 favor to everybody.

9      First of all, I find that the agents who

10 testified in this case forgot too many details about

11 many important things. You don't have to touch your

12 lawyer as if this was some sort of game here,

13 Mr. Mala. Okay? Because, believe me, I am not

14 helping you by doing this.

15      They forgot too many details, very important

16 details. Too many consistencies in the testimonies

17 regarding these issues. Not only that I find it

18 extremely bizarre and unusual that Mr. Hodges came on

19 this phone and he was put on this phone, talked to

20 Mr. Mala under the circumstance that we have heard

21 here. I find it very unusual. And I find it very

22 unusual that it was not documented. And I also find

23 very unusual the fact that nobody answered this phone.

24 And that nobody cared to answer this phone.

25 Especially in light of that bill that I saw.

YVETTE RICHARDSON, CSR, OCR

KELLY MALA - CROSS - ANDERSON

287

1 So under those circumstances I am going to do

2 a favor to everybody. I am going to convert this

3 case, which is a very simple case, that can be tried

4 in half a day. I am going to convert it by

5 suppressing these statements. And all that's going to

6 come before the jury when we try this case is the fact

7 that these people were stopped and they were found

8 with this cocaine in a 21-foot boat. I don't want to

9 hear about Home Depot. I don't want to hear about the

10 telephone calls and I don't want to hear about the

11 statements. It is as simple as that. And if he takes

12 the stand you'll impeach him with this conviction.

13 There is no way I am going to try this case with the

14 mess which the agents did themselves by doing sloppy

15 police work. That is what happened here. There is no

16 way.

17      MR. ANDERSON: Let me ask a question, Your

18 Honor. If during trial, which I am perfectly happy

19 with putting on the evidence that the two defendants

20 were caught with all this cocaine, and letting them

21 explain how they got it, if any defendant got on the

22 stand and gave some testimony different from the

23 statements, will we be able to cross-examine on that?

24      MS. HILL: Not without voluntariness.

25      THE COURT: This is sloppy police work. I

YVETTE RICHARDSON, CSR, OCR

KELLY MALA - CROSS - ANDERSON

288

1 don't like the way Mr. Hodge dealt with this issue.

2 It is entirely possible that in his own mind this man

3 felt he had to wheel and deal and he turned back and

4 sent all these notes to the agents to give to the

5 other guy. The agents should have never allowed this

6 to happen. Maybe these statements are the whole

7 truth, but maybe they are not. And I don't care what

8 happened other than the fact that they were caught

9 red-handed on a 21-foot boat with this cocaine and

10 heroin. And it is going to be very difficult to

11 explain before a jury. It is as simple as that and

12 that is what we are going try in this case.

13      MR. ANDERSON: We are going be ready on the

14 19th.

15      THE COURT: Doing it different will entail

16 the following, trying the credibility of one side over

17 the other. That is totally unimportant, and I am not

18 going to allow that to happen. So you decide what you

19 are going to do with this case. This is going to be a

20 very simple case. It can be tried in two hours.

21      MR. ANDERSON: I agree.

22      THE COURT: Any other questions?

23      MS. HILL: No, Your Honor.

24      THE COURT: Thank you very much.

25      MS. HILL: Thank you, Your Honor.

YVETTE RICHARDSON, CSR, OCR

289

THE DEPUTY MARSHAL:  All rise.

(Whereupon, Court adjourned at 5:30 p.m.)

- - - - -

YVETTE RICHARDSON, CSR, OCR

---

290

REPORTER'S CERTIFICATE

I, YVETTE RICHARDSON, Official Court
Reporter in the United States District Court for the
District of Puerto Rico, appointed pursuant to the
provisions of Title 28, United States Code,
Section 753, do hereby certify that the foregoing is
a true and correct transcript of the proceedings had
in the within entitled and numbered cause on the
date hereinbefore set forth; and I do further
certify that the foregoing transcript has been
prepared under my direction.

Whereunto I have set my hand this 9th day
of November, 2005.

December

_Yvette Richardson_
YVETTE RICHARDSON, CSR, OCR
Official Court Reporter

YVETTE RICHARDSON, CSR, OCR

233

1  have water and I am not        nning to get wet.  If you
2  run, you know what is going to happen.  And he just
3  looked down at his side like he has a firearm or
4  whatever it is.
5     Q    Okay.  So how did you interpret that?
6     A    I interpret it, after he takes off the
7  handcuff, if I were to make any movement that would
8  seem like I was trying to escape they would shoot me,
9  I would assume.
10    Q    Okay.  So then what happened?
11    A    He passes me the cell phone, a cell phone, at
12  the time we were a little bit inside the garage, the
13  signal cuts, so it is when I put it and I said hello
14  there was no one there.  So I told him there was no
15  one on the phone and I just pass it back to him.  As
16  he walks back out the phone rings again and he
17  answered it and he said hello and just passed it back
18  to me.
19         And at the same time he passes it was --
20    Q    Bermúdez?
21    A    Yes, ma'am.  At the time he passes it to me
22  there is a voice on the other end.  It says,
23  Mr. Kelly, I don't want you to say anything.  I just
24  want you to listen to what I have to say.
25    Q    Did you recognize the voice?
          YVETTE RICHARDSON, CSR, OCR

234

1     A
2     Q    Did he identify himself?
3     A    No.
4     Q    Go on.
5     A    The person at the time explained to me that
6  he was an agent from St. Thomas.  They are from St.
7  Thomas and that it is -- They want me to cooperate
8  with those guys over there and it is make a statement
9  and help those guys over there; or else, if I don't,
10  they would be seizing my business and my car.  And it
11  is where I park my boat from the registration on it
12  that reflects that is my parents property.  That they
13  would be seizing that property too.  And the gentleman
14  turned and said clearly that it is -- I know that you
15  have a civil case pending now -- because I had been in
16  a boat accident -- and that boat is parked too by your
17  mom.  It is that boat would be seized too.  I know
18  where it is parked and your mother would be arrested
19  in this case.  It is for being part of it, where you
20  park your boat.  That is part of this drug smuggling
21  case.  That is what he said.
22    Q    So he basically threatened you?
23    A    Yes, ma'am.
24    Q    With seizing your boat?
25    A    Yes, ma'am.
          YVETTE RICHARDSON, CSR, OCR

235

KELLY MALA - DIRECT - HILL

1     Q    Seizing your mother's property?
2     A    Yes, ma'am.
3     Q    Because your boats were parked there?
4     A    And the registration, that reflects on the
5  boat at the time we got arrested on, it is registered
6  to my parents as their property.
7     Q    Did he also threaten you with arresting your
8  mother, your father and your family?
9     A    My mom.
10    Q    Okay.  So this is all happening before your
11  actual writing of the statement?
12    A    Yes, ma'am.
13    Q    Okay.  So go ahead, continue.
14    A    So then he asks me how many kids I have.  I
15  said nine.  He said well, if you don't cooperate with
16  those guys over there and do the right thing, it
17  is -- I would make sure today you don't see your kids
18  again.
19    Q    He said that?
20    A    Yes, ma'am.
21    Q    Okay.  Did he finally identify himself?
22    A    No, Ma'am.
23    Q    Okay.  So how do you know that it was Hilary
24  Hodge from ICE in St. Thomas?
25    A    At the time he turns and tells me don't be
          YVETTE RICHARDSON, CSR, OCR

236

KELLY MALA - DIRECT - HILL

1  like Don Russell Robinson, he is now getting 20 to
2  life in St. Croix for bucking the system.  You better
3  help those guys over there and make a statement or
4  else you would be like him looking at 20 to life if
5  you don't cooperate.
6     Q    And what did you understand that to mean?
7     A    A threat or intimidation if I don't cooperate
8  with these guys and help them out, that they would be
9  seizing my mom's property and harassing my mom's
10  property and seizing my business too.
11    Q    So was this the end of the conversation, the
12  extent of it?
13    A    At that point it is.  I said -- I just stayed
14  there on the phone for a while like clenched.  It was
15  trying to see who it could be, and I gave the phone to
16  Bermúdez and I gave the phone to him and he starts
17  talking for a few minutes and he just laughs.  And he
18  hangs it up and he turns around to me and he said are
19  you ready now to make a statement.
20    Q    So Bermúdez actually spoke to Hilary Hodge
21  after you spoke to him?
22    A    Yes, ma'am.
23    Q    Continue.
24    A    After he hung up the phone he turned to me
25  and he asked me, are you ready now to make a
          YVETTE RICHARDSON, CSR, OCR

Appendix   Footnotes #1.

To Whom it may concern

    I Wendy Todd states on this day of November 28, 2005, that on August 11, 2005 on or about 7:10 p.m. to about 8:15 p.m. I called my boyfriend cell phone# (340-344-5938) and a lady answered the phone. The lady that answered the phone ask me who I was calling for Kelley Mala and I stated his girlfriend Wendy, who lives with him. I asked the lady who she was answering my boyfriend cell phone and she never answered me. I kindly asked her if I could speak to Kelley Mala and she hang up the cell phone on me. I got very upset wondering who was  that rude and disrespectful lady that hanged up the phone on me. I called the phone a few more times and she kept hanging the phone up. I keep calling back because I was very concerned why  Kelley Mala didn't call me back that evening after leaving that day to Puerto Rico to purchase tiles and some household materials to complete the repairs at his grandmother house in savan which is an areas in St.Thomas VI .

    I Wendy Todd calls Kelley Mala off of my cell phone (340 642-7088) I further states that Kelley Mala always keeps in touch with me through every given day to see if I eat and how I am feeling, due to the fact I am pregnant and I have serious pains on and off.

    The following day August 12 2005 a male person started calling my phone very often and I had to tell this person to stop calling my phone and harassing me and I then shut off my phone for a few days. At no time when I was calling my boyfriend phone did anyone tell me he was arrested, detained or in prison.

    I Wendy Todd also states that on August 10&11, 2005 Kelley Mala and I babysit his son Jamal Mala in the house. Around 12:00 p.m. Kelley Mala called Jamal Mala mother to make arrangement with her to drop him off to her because he was leaving the house to prepare to open the business and leave to go Puerto Rico and that was the last time I saw Kelley Mala that day.

    I Wendy Todd states and close that on or about November 12 2005, I personally spoke to Attorney Anita Hill , Kelley Mala Attorney via telephone communication and states to Ms.Hill about the event that took place on August 11,2005 when I try to contact Kelley Mala on his cell phone around 7:10 to about 8:15p.m. that even and the next day.

    This statement is true and correct and is given to the best of knowledge.

Wendy Todd
Po box 6493
St.Thomas vi 00804

Sworn to and Subscribed
before me
on this _16th_ day of _Dec._ , 20_05_
_Kathleen I Anthony_
Notary
_NP.069-03_
_may 4. 2007_

U.S. DISTRICT COURT OF PUERTO RICO     EXHIBIT 2.                    9

1                 THE COURT: Call your first witness.

2                      (The witness is sworn and testifies

3                      without the interpreter)

4                 DIRECT EXAMINATION

5                 OF MELVIN FIGUEROA

6    BY AUSA ANDERSON:

7        Q.    Sir, I will ask you to keep your voice up

8    loud, speak slowly and clearly.  Can you state your

9    full name for the record?

10       A.    Melvin Figueroa.

11       Q.    And by whom are you employed?

12       A.    By the Department of Homeland Security,

13   Customs and Border Protection.

14       Q.    How long have you been with them?

15       A.    I been approximately eight years now, so far.

16       Q.    Where are you stationed?

17       A.    At the San Juan office.

18       Q.    I will direct your attention to August 11,

19   2005, were you working that day?

20       A.    Yes, I was.

21       Q.    Where?

22       A.    Out of the eastern coast of Puerto Rico.

23       Q.    Where is that?

24       A.    Over in the vicinity of Culebra.

25       Q.    What were your duties that day?

07 0873

FILED

MAY - 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

10

1      A.    I was down there assigned to support the

2    Fajardo office, marine office, and they were expecting

3    what we call a target, that was going to arrive during

4    that day from a marine smuggling evolution. So we were

5    down there patrolling the area.

6      Q.    When you say patrolling, what do you actually

7    do for them?

8      A.    We patrol the boarders that belong to the

9    territory of Puerto Rico and the United States.  And

10   we do document checks on vessels and also do some

11   border checks if possible, if deemed possible.

12     Q.    How do you patrol, on foot, land?

13     A.    We have a 39 foot vessel, interceptor, and it

14   is a midnight express and we have at least three guys

15   on board and we patrol the borders that pertain to

16   U.S. territories.

17     Q.    Now,  on August 11, 2005 when you were out on

18   patrol, what was your actual position that day?

19     A.    That day I was close to the southwest shores

20   of Culebra, and we were on standby there, until one of

21   our air assets acquired one of the targets that we

22   were expecting to arrive.  I was patrolling that area,

23   the southwest shores of Culebra.

24     Q.    Now, on August 11, 2005, what was your

25   function on board your vessel?

1       A.    I was the vessel commander for the vessel.

2       Q.    What does that mean?

3       A.    Vessel commander means you are in charge of

4    the operation that goes on, on your vessel.  You are

5    responsible  for the well being of the vessel and your

6    crew that you have assigned.  That day I had three

7    more crew members assigned to my vessel.  And we go

8    out on patrol, if anything hanppens I am responsible

9    to control the vessel, get to a safe position and my

10   crew members will go ahead and proceed with the

11   boarding if we had to do a boarding.

12       Q.    So you are the actual vessel operator,

13   correct?

14       A.    Yes, sir.

15       Q.    How long was your vessel?

16       A.    39 foot.

17       Q.    And can you describe your vessel to us, what

18   does it look like?

19       A.    A 39 foot midnight express, open cabin and

20   has four engines, 225 horsepower each which makes it

21   900 horsepower total.  We have trained marine law

22   enforcement officers on board trained to do the

23   interception and boardings and everything out there.

24       Q.    What kind of marking do you have on your

25   vessel?

12

1      A.    Big police markings, which states it is a law

2   enforcement vessel.  It is painted white, so that you

3   can see in any type of lighting, it has big numbers on

4   the top to describe it as law enforcement vessel, it

5   has blue lights and a siren.

6      Q.    On August 11, 2005 you said you were in the

7   vicinity of Culebra, correct?

8      A.    Yes, sir.

9      Q.    Where did you launch from that day?

10     A.    That day specifically I launched from my

11  office out of San Juan, and went down to Culebra.

12     Q.    When you launched on August 11, 2005, did you

13  have a specific operation that you were involved in?

14     A.    I was involved in providing support to

15  Fajardo office, with possible target that they had

16  coming in, that was going to be doing some drug

17  smuggling on another vessel.  So I was assigned to go

18  there in case the target was located, I was going to

19  be the backup vessel for the primary vessel that was

20  assigned down there.

21     Q.    Directing your attention to approximately

22  4:00 p.m. on August 11, 2005, where were you?

23     A.    I was in the southwest coast of Culebra close

24  by to an island called Cayo Lobo, when we received

25  information that the air unit spotted a target that

1  seemed like it was the one we were waiting for.  The

2  primary vessel responded to the target and I was going

3  to back him up on that target.  And when I looked to

4  my left-hand side, which is the port, I spotted a

5  vessel closing in to Cayo Lobo, and it was getting

6  real close to shore.  I told my guy, since it was in

7  the same direction we were going to go patrol, to

8  backup the other vessel.

9      Q.    Let me stop you there.  When you are going

10  out on patrol and you know that you're going to backup

11  another vessel, on your way out to that location are

12  you and your crew making any kind of preparation for

13  what you are about to do?

14      A.    Yes, we always get ready before we are going

15  to go and do the intercept and me, as a vessel

16  commander, it is one of my responsibility to insure

17  that my crew has bulletproof vests, and check the

18  weapons and make sure everything is ready.

19      Q.    So this point you are going to go out and do

20  a marine interception, so this a law enforcement

21  operation?

22      A.    That is correct.

23      Q.    And you were headed away from the coastline

24  of Puerto Rico, correct?

25      A.    Actually we are heading out of Culebra, out

14

1    the west coast of Culebra so it is Puerto Rico,

2    Fajardo, so it is west bound.

3        Q.    And at that point did you know the location

4    of the vessel you were supposed to intercept?

5        A.    Yes, we did.    It was given us the location

6    and as I mentioned before, I was supposed to be a

7    secondary vessel and I was supposed to wait for the

8    first vessel to do the intercept and I was supposed to

9    stay behind the operation, that is so we don't have

10   any accidents.

11       Q.    So you are in route, heading west bound and

12   you see another vessel out your port side?

13       A.    That is correct, yes.

14       Q.    Approximately how far from your vessel was

15   this vessel when you first saw it?

16       A.    I would say it was approximately quarter

17   nodical mile to half mile at most.

18       Q.    What time of day was this?

19       A.    This was daylight time, about 1600, 4:00

20   p.m.

21       Q.    What did that vessel look like, if you

22   remember?

23       A.    It was a white vessel with a blue top, it had

24   one single engine, 200 horsepower engine, three people

25   on board.    They had alot of toolboxes and stuff on

1    deck, in the back.

2        Q.    Now, would you describe this boat as a center

3    console or cabin?

4        A.    It is center console and open cabin.

5        Q.    What is in front of the center console?

6        A.    Well, you might have an open space there,

7    where somebody could sit down or store equipment.

8        Q.    So on this vessel there is no shelter area,

9    correct, to go inside?

10       A.    No, it is fully open cabin.

11       Q.    So when you spotted this vessel, what did you

12    proceed to do?

13       A.    I insured that my personnel was ready and

14    told them that in our route to respond to the vessel

15    we were going to backup, I would go ahead and do a

16    document check on this vessel, because the way they

17    were operating seemed like they were trying to hide

18    something.  Because it is a tactic that they use, get

19    close to the island so we don't pick them up in the

20    radar.  Actually the vessel was going pretty fast and

21    getting closer to shore on the Cayo Lobo.

22       Q.    So the way the vessel was operating raised

23    your suspicion, correct?

24       A.    Yes.

25       Q.    What did you proceed to do?

16

1     A.    I told my guys to get ready because we were

2  going to do an intercept and do a document check on

3  this vessel, prior to backing up the other vessel that

4  we had out there.  As soon as we got closer to it, it

5  just kept on speeding up.  I had my lights and siren

6  on and they wouldn't stop, so I told my guys get

7  ready, because the vessel does not want to stop.  It

8  seems like we are not dealing with good guys here,

9  because any vessel that we put the hailers on and the

10  blue on and they did don't stop, we sped up to catch

11  up to them and they kept going.  Once I got close

12  enough to them, because we had four engines, one of my

13  crew members which was Juan Clemente, yelled at them

14  to stop the engines and they kept ongoing.

15     Q.    Let me stop there for a second.  From the

16  moment that you first saw the vessel, how long

17  approximately did it take you to actually get up along

18  side?

19     A.    I would say about eight or ten minutes

20  probably, because of the power we have in our boat

21  versus what they had.

22     Q.    At what point did you turn on your lights and

23  sirens?

24     A.    Approximate pretty close do them, because we

25  want to make sure they hear the sirens, so I don't

1    turn it on way back there.  I make sure we are close

2    enough.  Less than a quarter mile to them I turned

3    them on to make sure if they look back and see us,

4    they notice we are trying to stop them.  Usually what

5    happens they will stop their engines.

6        Q.   What, if any reaction, did you get from this

7    vessel when you first put on your lights and sirens?

8        A.   I got the reaction that they were trying to

9    flee, because they never stopped, they actually sped

10   up a little bit more.  So I had to speed up my vessel

11   to match the speed and get next to them.

12       Q.   Do you remember who was operating the vessel?

13       A.   Yes.

14       Q.   Do you see the person in court today?

15       A.   Yes, sir.

16       Q.   Can you point to him and describe what he is

17   wearing.

18       A.   He has a gray shirt, and Mala is his name.

19       Q.   Your Honor, could the record reflect that the

20   witness is indicating the defendant, Kelly Mala.

21               THE COURT: Yes.

22   BY AUSA ANDERSON:

23       Q.   When you first approached Mr. Mala's boat, by

24   the way was Mr. Mala's boat the vessel that you were

25   originally going to intercept with your fellow

1   officers?

2       A.   No, it was not.

3       Q.   So his was not the vessel that you had

4   received prior information from the air unit, correct?

5       A.   That is correct, that is not the vessel.

6       Q.   When you first approached Mr. Mala's boat and

7   put on your lights and sirens, do you remember if Mr.

8   Mala ever looked back to acknowledge your presence?

9       A.   No, I don't recall him looking back.

10      Q.   How many other people were in the vessel?

11      A.   Two more people, a female and a male.

12      Q.   Can you describe for us where in the vessel

13  the two other individuals were when you first

14  approached the vessel?

15      A.   The female was sitting to the right-hand side

16  of Mr. Mala, and the other person was standing on the

17  back of the vessel on the stern of the vessel.

18      Q.   And which way were all three individuals

19  facing?

20      A.   They were facing forward of the suspect

21  vessel.

22      Q.   When you first put your lights and sirens on,

23  did anybody in that vessel turn and look and

24  acknowledge your presence?

25      A.   I couldn't recall if they actually looked

19

1    back.   But when we got side by side, they obviously

2    knew we were there.

3         Q.    When you got side by side to Mr. Mala's

4    vessel, what happened then?

5         A.    One of my crew members, officer Clemente

6    started yelling them to turn the engines down, turn

7    the power down or stop the vessel and he just

8    continued on going.   So we overpowered that vessel, so

9    I stayed right next to them side by side, and on

10   various occasions officer Clemente told them to stop,

11   until they stopped the vessel.   And they were talking

12   together, and I was on the radio telling the air unit

13   and other vessels what was going on, because I could

14   not go to support the other vessel that was doing the

15   intercept.   So I had to make coordination to have a

16   third vessel provide support to the vessel that I was

17   supposed to backup.   So I was in conversation on the

18   radio.

19        Q.    In your training experience as a law

20   enforcement officer, specifically marine enforcement,

21   when you come upon a vessel and put on your lights and

22   sirens, do the vessels usually stop?

23        A.    Yes, they do sir.

24        Q.    So in this situation when the vessel did not

25   stop, what did that indicate to you in your training

1    toolboxes and shoe box?

2        A.    The backpack.

3        Q.    What else was there inside of the boat?

4        A.    Three suspects that we arrested.

5        Q.    Was there anything else inside of the boat?

6        A.    A piece of wood and other things in there.

7        Q.    Safety equipment?

8        A.    Probably a boat hook or something that was

9    there with the wood.

10       Q.    Now, you said that you were going to

11   intercept another vessel, but that you changed your

12   mind on your way there, because you saw Mr. Mala's

13   vessel, correct?

14       A.    I was going to support the intercept of the

15   other vessel.  Which means that I was not directly

16   involved with the other vessel, I was going to stay

17   behind until the primary vessel did the intercept.  In

18   the meantime while I was traveling to that vessel that

19   is when I spotted Mr. Mala's vessel.

20       Q.    The reason why you had targeted another

21   vessel, among other things, is that you had air

22   communication?

23       A.    Yes.

24       Q.    So somebody in the air was going around the

25   area,  and saw another vessel that you mentioned was

1    the target?

2        A.    They spotted the target vessel we were

3    looking for, yes.

4        Q.    So while you were going towards the target

5    vessel there was somebody in the air or a helicopter

6    checking the area, correct?

7        A.    Yes, that is correct.

8        Q.    While you were on your way to the target

9    vessel did you see the airplane?

10       A.    No, they fly pretty high, and we are under a

11   bimini top and we can't look straight up and see them.

12       Q.    Now,  you said that the vessel that Mr. Mala

13   was operating had the option to turn to land.  He had

14   the option to turn to land and if he had done that,

15   that vessel would have reached land before you did,

16   correct?

17       A.    That is correct.

18       Q.    But the fact is that in this case Mr. Mala

19   never turned the boat to the land and never got to the

20   land?

21       A.    That is correct.

22       Q.    Although he had the chance to do it?

23       A.    Well, we were right next to him, so I don't

24   think that he had the option.

25       Q.    You said it was eight to ten minutes, from

Exhibit  3

**U.S. Department of Homeland Security**
Washington, DC 20229



**U.S. Customs and Border Protection**

JUL 20 2006

Mr. Kelley Norman Mala
Metropolitan Detention Center
P.O. Box 2147
San Juan, PR 00922-2147

Dear Mr. Mala:

This is in response to your letter dated May 7, 2006, in which you requested, pursuant to the Freedom of Information Act (FOiA) and/or Privacy Act, access to records pertaining to you pursuant to the Freedom of Information Act (FOAI) and Privacy Act (PA).

On July 14, 2006, this office received your request for information, pursuant to the Freedom of Information Act (FOIA), and the Privacy Act (PA), where you requested and I quote, "Any department Marine Enforcement or Air Marine Enforcement, Customs, received and instructed MEO Officers of the Fajardo Boathouse Officers of Customs Border Patrol, FURA Officers, Marine Enforcement Officers or any other Marine Patrol U.S.C.G. to patrol east end of Puerto Rico for suspected boat "White in color" or to conduct surveillance of such boat to be smuggling contraband from St. Thomas Virgin Islands or Culebra." The Office of Customs Border Protection Air and Marine found no responsive records matching your request. However, please be advised that any identifiable records responsive to your request would have already been provided to you by Immigration Customs Enforcement, Office of Investigations.

Insofar as you may consider the withholding of the documents a denial of your request for disclosure, you may appeal this determination, in writing, within 35 days after the date of this letter to Joanne Stump, Office of Ruling and Regulations, Attn: FOIA Appeals, 1300 Pennsylvania Avenue NW, Mint Annex, Washington, DC 20229.

Enclosed is an information sheet pertaining to exemptions from disclosure under the FOIA, administrative appeal and judicial review.

Sincerely,

Michael C. Kostelnik
Assistant Commissioner
Office of CBP Air and Marine

Enclosure

07 0873

FILED

MAY - 9 2007

NANCY MAYER WHITTINGTON, CLERK

 Exh

*Office of Investigations*
P.O. Box 13356
San Juan, PR 00908

 **U.S. Immigration and Customs Enforcement**

MAY 1 8 2006          06-FOIA-001MRA

Mr. Kelley Norman Mala
Reg. No: 01995-094
Metropolitan Detention Center
P. O. Box 2146
Guaynabo, P.R. 00922-2147

Dear Mr. Mala:

This is in response to your letter dated May 7, 2006, wherein you requested access to records pertaining to you pursuant to the Freedom of Information Act (FOIA) and Privacy Act (PA).

On January 18, 2006, this office responded to your previous FOIA request. The search disclosed sixty-five (65) records related to your petition. However, it was determined that portions of the documents are exempt from disclosure pursuant to exemptions (b)(2) (b)(6) (b)(7)(c) and (b)(7)(e) of the Freedom of Information Act. Those records were mailed to you on January 18, 2006.

In this second request for information, pursuant to the Freedom of Information Act (FOIA), and the Privacy Act (PA) you are requesting, and I quote, "**Any department Marine Enforcement or Air Marine Enforcement, Customs, received and instructed MEO Officers of the Fajardo Boathouse Officers of Customs Border Patrol, FURA Officers, Marine Enforcement Officers or any other Marine Patrol U.S.C.G. to patrol east end of Puerto Rico for suspected boat "White in color" or to conduct surveillance of such boat to be smuggling contraband from St. Thomas Virgin Islands or Culebra.**"

The Immigration and Customs Enforcement, Office of Investigations, does not have any Marine Enforcement or Air Marine Enforcement Unit. These units, including the United States Border Patrol, belong to the Department of Homeland Security, Customs and Border Protection.

The FURA Officers belong to the Puerto Rico Police Department which is part of the Government of Puerto Rico. The United States Coast Guard is a different department within the Immigration and Customs Enforcement.

I recommend that you address your request pursuant to the Freedom of Information (FOIA) and Privacy Act (PA) to each one of them. However, I will be referring your request to the Customs and Border Protection.

Exh ███ █████

Mr. Kelly Norman Mala
Page 2

Any further questions concerning the records that were mailed to you back in January 2006, you can contact Senior Special Agent Miguel R. Ayuso, FOIA Coordinator for the ICE Office of Investigation, SAC San Juan.

Sincerely,

Lydia St. John-Mellado
Acting Special Agent in Charge

 Exh

#1 La Puntilla Street
Old San Juan, PR 00901

 **U.S. Customs and Border Protection**

November 23, 2005

DIS 1-FO-CBP:PR:MS  LW

Mr. Kelley Norman Mala
Metropolitan Detention Center
P.O. Box 2147
San Juan, P.R. 00922-2147

Dear Mr. Mala:

This is to acknowledge receipt of your letter dated October 16, 2005 and received in this office on November 16, 2005. You have requested information under the Freedom of Information Act, Title 5 U.S.C. 552, reference to the seizure of a 21' vessel, registration #VI-8320-T.

Your request has been forwarded to the Bureau of Immigration and Customs Enforcement. As soon as a determination has been made concerning your request, that office will respond directly to you.

If you have any further questions concerning this request, you may contact BICE, Capitol Building, 800 Ponce de Leon Avenue, 12th Floor, Santurce, Puerto Rico 00908 at (787) 729-5166.

Sincerely,

Maria Palmer
Area Port Director

cc: Bureau of Immigration and Customs Enforcement

Exh █████████

OCTOBER 18/2005

KELLEY N. MALA
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
#01995-094
P.O.BOX 2147
MDC
SAN JUAN,P.R. 00922

ENF-4-OFO-:J:AP:FPF SC
CN:2005-4904-000017-01
U.S. CUSTOMS AND BORDER PROTECTION HOMELAND SECURITY:

DEAR Ms.Sonia Colon,

I have already submitted a request under FOIA for Communication reports
of Customs Border Agents MEO Officers reports and log books, I would also
like to amend and add to my request under FOIA, the following request reports

1. Any reports or log phone calls to MEO office or MEO officers, from
AMO-CBP requesting or instructing officers of MEO or AMO to investigate or
survillance east of Puerto Rico Culebra/Farjardo area of a white or blue
small vessel on AUGUST 11/2005 ...

Please attach to my original request of Oct 16/2005 under FOIA, A quick
responce will be appreciated.

================================
Kelley Mala

Exit 

KELLEY MALA
#01995-094
S/S 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
P.O.BOX 2147
METROPOLITAN DETENTION CENTER
SAN JUAN,P.R. 00922


ATTN OFFICE OF INVESTIGATION
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

RE: 06=FOIA-001MRA
    ENF-4-OFO-:JAP:FPF SC
    CN:2005=4904-000017-01


DEAR MR.LEO MORALES,

    PETTIONER KELLEY MALA UNDER DUE-PROCESS AND FOIA, RESPECTFULLY REQUESTIN
COPIES OF ANY AND ALL REPORTS,DOCUMENTS,RECORDS OF AUGUST 11/05, WHERE AS
ANY DEPARTMENT MARINE ENFORCEMENT OR AIR MARINE ENFORCEMENT, CUSTOMS,
RECEIVED AND INSTRUCTED MEO OFFICERS OF THE FAJARDO BOATHOUSE OFFICERS
OF CUSTOMS BORDER PATROL, FURA OFFICERS, MARINE ENFORECMENT OFFICERS OR
ANY OTHER MARINE PATROL U.S.C.G. TO PATROL EAST END OF PUERTO RICO FOR
SUSPICED BOAT "WHITE IN COLOR" OR TO CONDUCT SURVILLENCE OF SUCH BOAT,
TO BE SMUGGLING CONTRABAND FROM ST.THOMAS VIRGIN ISLANDS OR CULEBRA.

    AGAIN THIS MY SECOND REQUEST TO SUCH INFORMATION ATTACH IS COPY OF
SUCH REQUEST AND FURTHER STATE, AS HAVE BEEN CROSS REFERENCE TO MY CASE,
ON THE SAME DAY I WAS UNLAWFUL SEARCH AND SEIZED BY MEO OFFICERS OF CUSTOMS
DEPARTMENT ON AUGUST 11/05, A OTHER INDIVIDUAL WAS ARRESTED TWO HOURS LATTER
BY THE NAME OF DANIEL COLON SANTIAGO, I AM REQUESTING COPY OF THE WRITTEN
CONSENT SEARCH FORM THE MEO OBTAINED TO SEARCH SANTIAGO VESSEL, THE
INFORMATION IS RELEVANT AND PERTAIN TO ME DUE THE EVIDENCE, TESTIMONY OF
THE MEO IN MY TRIAL REFLECTS OF EVIDENCE OF THIS CASE, I AM AWARE OF SUCH
INFORMATION EXIST THE MEO AGENTS TESTIFY TO SUCH AND I WOULD LIKE COPIES
SEE ON THE RECORD KELLEY MALA V.NEGRON/CLEMENTE "ET AL CIVI.NO.06-1146(PG).

    THIS REQUEST IS SUBMITTED UNDER 28 U.S.C. 1746 PENALTY OF PERJURY

KELLEY N.J. MALA
DOB 2/24/67              PETITIONER REQUEST THIS INFORMATION EXPEDITED
S/s 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          14 WORKING DAYS.
USM#01995-094
5/7/06 Date.                 C/C SUBMITTED DISTRICT COURT DOCKET
                             U.S. DISTRICT COURT PUERTO RICO
                             CIVIL NO.06-1149(PG)

CERTIFIED MAIL #. 5 2150 0000 4862 3637

E X H I B ᵢ T  4.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OR AMERICA    )
    Plaintiff,    )
        )    CRIM.NO. 05-286(JAF)
    v.    )
        )
OTILIO CARRASCO    )
    Defendant    )
        )
_____)

**NOTICE OF SUBPOENA DUCES TECUM**

**RECORDS,REPORTS DELIVERY ONLY.TESTIMONY WILL BE REQUIRED**
**IF NON COMPLIANCE PERSIST UP UNTIL DATE HEREIN LISTED.**
**(IF REQUESTED RECORDS/REPORTS ARE MAILED IN OR FILED ON**
**PUBLIC SIDE OF DOCKET IN CAPTIONED CASE,YOU NEED NOT APPEAR)**

To:
    AUSA SCOTT ANEDERSON Attorney for Customs MEO's
    350 Carlos Chardon Ave/1201 Suite Torre Chardon BLDG
    Hato Rey,Puerto Rico,00918

    You are hereby commanded to file on the public side of docket
and provide and mail copies to undersigned to address C/O
METROPOLITAN DETENTION CENTER, P.O. Box 2147,San Juan,P.R. 00922-
2147, on or before January 5,2007, the following documents:

    1. All reports/records of "Customs Aircraft" Omaha 470 and
W/Blackhawk 465  Air patrol and survillance and communication of
Customs Marine Enforcement Officers and vessel spotted "target vessel"
on August 11,2005 .

    2. All reports/records position and communication Apcon,Topcon,
Borinquen (OPS) Omaha/W/Blackhawk and U.S. Customs MEO vessel of
August 11,2005 and all video recorded sky survillance on August 11,
2005. and flight plans log. As mentioned and testify by MEO's on
December 19,2005 under oath trial proceedings in the above caption
case.

FILED

MAY - 9 2007

07 0873

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

page '2.

USA v. OTILIO CARRASCO,Crim.NO. 05-286(JAF)
NOTICE OF SUBPOENA DUCES TECUM


In the event that these attestation,records,reports or video
don not exist:

A certified Document of Non-existence of requested document(s).
These documents will be inspected and may be copied. You will not
be required to surrender the original items. You may comply with this
notice of subpoena by giving legible copies of the item(s),requested
to the Natural person whose name is the undersigned signor of this
Subpoena,on or before the scheduled date of production. You have the
right to object to the production pursuant to this subpoena at any
time by giving written notice to the natural person who is the under-
signed of this document.

If you fail to :

(a) furnish the documents requested;or

(b) object to this subpoena,you may be in contempt of court.

You are subpoenaed by the Otilio Carrasco In Propria Persona
whose name appears on the subpoena, you shal respond as directed.

If you choose to:

(c)  not respond;or

(d)  seek or adhere to excusal from the court,

It will be deemed confession of wrongdoing, information or reports/
records don't exist and express consent to be sued in personal,
individual and official capacity,expressly waiving any and all
immunities and the testimony submitted before was fraud/deceit and
such events,survillance,communication with Omaha and MEO vessel false;
on August 11,2005 around the  waters of Culebra/Farjardo.

page 3.

          You are hereby given timely notice of requested information

documents,records,reports,video survillance, failure to comply

within the time stated by receipt of this notice certified postal

mail service 7 days in receipt of this notice and respond with copies

of documents will consider admission of default as govern by UCC law

Civil/Criminal and Admiralty Maritime judicial proceedings.

Respectfully submitted.

Dated:January 2,2007


_oTilio CARRASCO_

Otilio Carrasco In Propria Person
Without Prejudice UCC 1-207
(TODAY 2006) UCC 1-308


**Certificate of Service**

I have cause a true and exact copy this Notice of SUBPOENA to served
on AUSA Scott Anederson "Attorney" for Respondent MEO's 1201 Torre
Chardon BLDG 350 Carlos Chardon St, Hato Rey,P.R. 00918 postal mail
service prepare certify service this day January 2,2007

          cert. true and correct.
          28 USC 1746


                    _oTilio CARRASCO_

Certified mail #7006 2150 0000 4862 4153

Otilio Carrasco
#28740-069
P.O. Box 2147
MDC Guaynabo
San Juan,P.R.
00922

DATED: January 28,2007

Re: Duces tecum Subpoena for Records:
AUSA Scott Anderson  USA v. Carrasco,Mala,crim.#05-286(JAF)

### Notice of Fault and Opportunity to Cure
### and Contest Acceptance


Dear Mr. Anderson,

On January 2,2007;the undersigned caused to be sent to you,request inspection of reports,records or files pursuant Duces Tecum Subpoena notice via Certified mail Number 7006 2150 0000 4862 3637 wherein you were under obligation to respond to the Proof of Claims          Your failure to responce/silence is acceptance and stipulation amount to Carrasco request proof of claim, that such requested information of reports or records don't exist and your silence attestation is proof of claim such testimony sworn by your witnesses on December 19,2005 before the Court and upon the jury demonstrates fraud and deceit, fabrication knowingly,intentionally and wilfully "constitutional impermissble application of the statue",.My Liberty Interest.

Your acts and action reflects breach of your fiduciary duties and Oath of Office 28 CFR 0.151. and the injuries and damages cause to me and liberty interest as in the above request information;amounts via TORT CLAIMS 28 CFR 0.39 et seq "OIG,"OPR" 28 CFR 14.2 et seq.

Claimant Otilio Carrasco wants to expeditedly resolve such matters failure to rebutt is agreement consent waiver all immunity protection and liability to Tort or any Judicial Court proceedings 28 USC 1350, 28 USC 1331. STARE DECISIS..

page 2 of 2.


        Otilio Carrasco given 3 days from notice to respond UCC 1-202
in the above matters or accepted as fault/default Proof of Claims
the requested information,records,reports or testimony sworn was
fabricated,false,perjurious Fraud and Deceit upon the Court.


        Respectfully Submitted

Dated: January 28,2007

        Without Prejudice UCC 1-207


_____
Otilio Carrasco In Propria Personam
(TODAY '2007' UCC 1-308)
Notice Given UCC 1-202
Not in any Agreement with Government
UCC 1-103..
Invoking Unlimited Commercial Liability

Certified Mail # 7006 2--0 0000 4862 3514

#5800 3514

E X H I B I T  5.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA )
     Plaintiff/Respondent, )
                         )
     v.                  )       CRIM.NO. 05-286(JAF)
                         )
KELLEY MALA )
     Defendant/Petitioner )
                         )

## NOTICE OF SUBPOENA DUCES TECUM

RECORDS DELIVERY ONLY.ORAL TESTIMONY WILL BE REQUIRED IF
NON-COMPLIANCE PERSISTS,UP UNTIL DATE HEREIN LISTED.
(IF REQUESTED RECORDS ARE MAILED IN OR FILED ON THE PUBLIC
SIDE OF DOCKET IN CAPTIONED CASE,YOU NEED NOT APPEAR)

To: Frances Rios de Moran,
    Clerk of DISTRICT COURT PUERTO RICO
    150 CARLOS CHARDON AVE
    HATO REY,PUERTO RICO-00918-1767

    You are hereby commanded to file on the public side of the docket, in the

captioned criminal case;and mail copies to the undersigned to address provided

herein,C/O,01995-094, METROPOLITAN DETENTION CENTER,P.O. BOX 2147,San Juan

00922-2147, on or before January 10,2007 A.D.,the following documents:

1.   Proof of compliance with USC 5,section 2903,**2906,3331,** and USC 28, sections

543,544, and Article VI clauses II and III, of the Constitution of the UNITED STATES

Assistant United States Attorney Scott Anderson. Specifically,Certified,(Attestation

by you as to filing with your office),of their  respective Oath of Office/Affidavit

Affirmation, before the initiation of the captioned criminal case.

07 0873



FILED

MAY - 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# 5800083514

2.  Or in the event that these Attestation do not exist:

A certified Document of Non-existence of requested document(s).

These documents will be inspected and may be copied. You will not be required to surrender the original items. You may comply with this subpoena by giving legible copies of the item(s),requested to the Natural person whose name is the undersigned signor of this Subpoena, on or before the scheduled date of production. You have the right to object to the production pursuant to this subpoena at any time by giving written notice to the natural person who is the undersigned of this document.

If you fail to:

(a) furnish the documents requested;or

(b) object to this subpoena, you may be in contempt of court.

You are subpoenaed by the "pro-se" litigant,Natural person whose name appears on the subpoena and, unless excused from the subpoena by same Natural person/ Pro-se  litigant or the court, you shall respond as directed/

If you choose to:

(a) not to respond;or

(b) seek or adhere to excusal from the court.

It will be deemed confession of wrongdoing,fault,and express consent to be sued in your personal,individual, and official capacity, expressly waiving any and ALL immunities: consenting to produce your own Oath of Office, surety, performance bond or blanket bond with name and address of insurer,bond number, social security  number, public or private pledges or otherwise to indemnify the undersigned as to any injuries and violations against secured Right(s),or interest(s) of the Undersigned.

Dated: January 4,2007          Kelley Norman Joseph Mala

Respectfully Submitted

*Kelley Norman Joseph Mala*

Kelley Norman Joseph Mala Pro-Se

Without Prejudice UCC 1-207(TODAY 2007-UCC 1-308)

Kelley Mala C/O 01995-094
MDC GUAYNABO
P.O.BOX 2147
SAN JUAN,P.R. 00922-2147
(UNITED STATES MILITARY COMPOUND).

ADMINISTRATIVE OFFICE OF UNITED STATES COURTS
THURGOOD MARSHALL FEDERAL JUDICIARY BUILDING
ATTENTION:"HOLDER OF OFFICE"-DIRECTOR.
ONE COLUMBUS CIRCLE,N.E.
WASHINGTON,D.C. 20544

    RE: Complaint of abdication/abrogation of SWORN duty,by FRANCES
RIOS DE MORAN; Clerk of the Court,UNITED STATES DISTRICT COURT OF
PUERTO RICO".

Dear, Holder of Office,"Director",

    I the Undersigned, in my Natural and Personal Capacity;that
Mr. Frances Rios De Moran, in his personal and Official Capacity,
contrary to Statute,is "Practicing Law",thereby creating an
obstruction of our court processes and justice:all in Contravention
to his **OATH OF OFFICE,and U.S.C. 18 section 2076,and see as in
U.S.C. 28 sections,604(a)(1),610,751,953,955;**and files this complaint.

    Specifically,we have respectfvely requested Cerified Copies of
the Oaths of Office for the **FORMER,** Assistant United States
Attorney Scott Anderson. That is proof, that they complied with
U.S.C. 5 sections 2906,3331. Mr. De Moran HE HAS CONSISTENTLY
REFUSED FOR OVER ▮▮▮▮▮▮. I seek your intervention in obtaining
these **PUBLIC RECORDS.**

Respectfully Submitted,pusuant to USC 28 sec.1746 & Undersigned
unlimited Commerical Liability:This Date,November,28,2006,A.D.

*Kelley Norman Joseph Mala C/o 0.995-094 Pr.se*

Kelley Norman Joseph Mala,C/O 01995-094

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

TO THE CLERK OF THE COURT,

In Re:   Reguest for Assistant United States Attorney Scott Anderson
         file docket Oath/Affirmiation Affidavit Appointment of Office.

November 16,2006

Dear Clerk Of the District Court,

    I Kelley Mala Petitioner/Defendant in Crim.NO. 05-286(JAF)-Civ.No.
06-1149(PG). Request and seeking for copy of AUSA Scott Anderson oath
of office file in the District Court of Puerto Rico pursuant to
5 U.S.C. 2903, 3331 and USAM Title 3-4.000  See attach and as Executive
Office for United States Attorneys quated see attach, this is public
record and may be obtained from the clerk of the court.
    I also attach as proof such document exist in your file and is
provided to the public or me as requested by law. 28 U.S.C. 544.
    I Kelley Mala further avers and sought such request is permissible
and authorized by law U.S.C. 28 section 1361 and 18 U.S.C. 2076.

    Petitioner/Defendant Kelley Mala In Propria Persona respectfully
submits and states expedited responce and attention invoked according
to law and U.C.C. Mala's Uniform Commercial Liablity Unlimited Clause.

                        Submitted Respectfully

                        _____
c/c. files...           Kelley Mala In Propria Persona

Kelley Mala
#01995-094
P.O.BOX 2147
MDC GUYYNABO
SAN JUAN,P.R.                              November 28,2006
00922


Attn: UNITED STATES DISTRICT COURT OF PUERTO RICO
      CLERK OF THE COURT FRANCES RIOS DE MORAN:

USA v. Mala,Crim.NO. 05-286(JAF).


Dear Mr. De Moran,


I have written in request for a copy of AUSA Scott Anderson Oath of Office and

Affirmaition/Affidavit pursuant to 5 U.S.C. 2903,2906,3331.  I have received
no responce or effort of such information that is public record and is privilige
to me.
I also bring to your attention as mentioned and as I quote from F.S. Court for
The First Circuit Office of Executive "Assistant Executive Florence Pagano"
stated on November 7,2006 The Clerk Of the Court for U.S. District Court Puerto
Rico has to provide such information and material of AUSA Scott Anderson Oath
and Affirmaition Affidavit file in the Clerk Office.
As I also quote from Executive Office for United States Attorneys  FOIA/PA
William G.Stewart II. office Acting Assistant Director, this information and
material can be obtained from Clerk of the District Court of Puerto Rico for
AUSA Scott Anderson once it has been file.
Again as to my request for such materials, I tenderly request in an expedited
manner these information is provided by certify proof of filing with this Court
or a responce. Pursuant to Uniform Commercial Code U.C.C. notice has been given
and failure to provide such information is consider by law and statute Obstruction
of Justice 18 U.S.C. 2076 or must be interpretated never has been file within
this District Court of Puerto Rico pursuant to Law 5 U.S.C. 2906,3331,et seq.

                    Submitted Respectfully.


28 U.S.C. 1746..              Kelley Mala In Persona Unlimited Capacity

c/c files Adminstrative Office U.S. Courts Washington
     Executive Office First Circuit Judicial Council.

*Executive Office for United States Attorneys*
*Freedom of Information/Privacy Act Staff*
*600 E Street, N.W., Room 7300*
*Washington, D.C. 20530*
*202-616-6757  Fax 202-616-6478*

E X H I B I T .#5 part B

U.S. Department of Justice

Request Number: 06-3253        Requester: Kelley Mala

Subject: AUSA Scott Anderson (Oath of Ofc.)/DPR

The Executive Office for United States Attorneys (EOUSA) has received your Freedom of Information Act/Privacy Act (FOIA/PA) request. It has been assigned the above number. Please give us this number if you write about your request. If we need additional information, we will contact you within two weeks.

Your request will be placed in the order in which it was received for processing, unless it is a very large request (Project Request). Then, it will be placed in a separate group of Project Requests, which are also processed in the order received.

EOUSA makes every effort to process most requests within a month (20 working days). There are some exceptions, for example, Project Requests take approximately nine months to process. Requests for "all information about myself in criminal case files" are usually Project Requests. If you have made such a request, you may either write us and narrow your request for specific items, or you may expect that the processing of your request may take nine months from the date of this letter.

By making a FOIA/PA request, you have agreed to pay fees up to $25, as stated in 28 CFR § 16.3(c), unless you have requested a fee waiver. Please note that pursuant to 28 CFR § 16.11, we are required to charge fees for time used to search for the documents you have requested and for duplication of all pages released to you. Normally, search time is charged at a rate of $28 per hour after the first two hours which are free, and duplication fees are $0.10 per page after the first 100 pages which are free. Please do not send any payment at this time! If we anticipate that fees will exceed $25 or the amount you have stated in your letter (if greater than $25), we will normally notify you of our estimate of fees. After we have received your agreement to pay for the expected fees (or you have narrowed your request to reduce fees) and we have processed your request, we will require payment for the accumulated charges before we release documents to you. Without such payment, your request file will be closed without further action.

Sincerely,

William G. Stewart II
Acting Assistant Director

Form No. 001 -1/06

delegated to particular United States Attorneys' offices (USAOs) to the extent that such a delegation will promote the effective accomplishment of the mission of the USAO. Specific delegations will be in writing, and are subject to modification or revocation as necessary.

**B.  Oath of Office.** All employees are required to execute an oath of office (Appointment Affidavit, SF-61) upon appointment (*see* 5 U.S.C. §§ 2903, 3331). The Director, EOUSA, is authorized to administer personally and to delegate authority to administer the oath of office. United States Attorneys and the Assistant Director, Personnel Staff, are delegated such authority by the Director, EOUSA. Any redelegation of this authority must be in writing.

## 3-4.273 Personnel Management Evaluation

Other reference(s): 28 C.F.R. § 0.22

Personnel management evaluations will be conducted on a regular basis for districts with specific written delegations of personnel authority from the Executive Office for United States Attorneys. The purpose of these evaluations is to: assess and analyze the effectiveness of the personnel management program in the United States Attorney's office; assist in identification and resolution of personnel management problems; assess compliance with governing laws, regulations and policies; and analyze the overall organizational effectiveness of the personnel management program of the office. Recommendations on methods to resolve any problems identified during the review will be rendered by an evaluation team charged with the responsibility for conducting the review.

## 3-4.274 Corrective Actions

Other reference(s): None

United States Attorneys' offices (USAOs) which have been delegated personnel authority are responsible for taking all appropriate corrective actions to ensure personnel actions processed fully comply with applicable guidelines. Failure by a USAO to take such corrective actions may serve as a basis for withdrawal or suspension of delegated personnel authority in accordance with USAM 3-4.250.

## 3-4.293 Personnel Records

Other reference(s): APHIs/Personnel/Chapter 293 #s 1 & 2; OPM Operating Manual - Guide to Processing Personnel Actions; OPM Operating Manual - Guide to Personnel Recordkeeping; 5 C.F.R., Part 293

Official personnel files will be maintained by the Personnel Staff, Executive Office for United States Attorneys (EOUSA), or by the United States Attorney's office with authority delegated by EOUSA.

## 3-4.294 Availability of Official Information

Other reference(s): 5 C.F.R., Part 294; 28 C.F.R. § 16

Requests for disclosure of personnel information are to be forwarded to the Personnel Staff, Executive Office for United States Attorneys (EOUSA), or to the United States Attorney's office if it has been delegated personnel authority by EOUSA.

CM/ECF LIVE - U.S. Distric.    .urt for the District of Puerto Rico - D .et Report        Page 1 of 2

**EXHIBIT #6.**

| | | |
|---|---|---|
| 10/30/2006 | ⊙199 | RENEWED MOTION for New Trial or Alternatively to Dismiss with Prejudice by Kelly Mala, Pro Se. Suggestions in opposition/response due by 11/13/2006 (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Envelope)(ft, ) (Entered: 10/30/2006) |
| 11/08/2006 | ⊙200 | INFORMATIVE LETTER motion requesting temporary restraining order, etc. by Kelly Mala, pro se. (ft, ) (Entered: 11/09/2006) |
| 11/08/2006 | ⊙201 | MOTION to Amend 199 MOTION for New Trial MOTION to Dismiss filed by Kelly Mala, by Kelly Mala, Pro Se. Suggestions in opposition/response due by 11/21/2006 (Attachments: # 1)(ft, ) (Entered: 11/09/2006) |
| 11/13/2006 | ⊙202 | MOTION Submitting newly discovery information to be attached as exhibit to motion re: newly information/dismiss with prejudice by Kelly Mala, pro se. (Attachments: # 1 Affidavit # 2 Envelope)(ft, ) (Entered: 11/14/2006) |
| 11/14/2006 | ⊙203 | Second MOTION to Strike Re: 201 MOTION to Amend/Correct 199 MOTION for New Trial MOTION to Dismiss filed by Kelly Mala, filed by Kelly Mala,, 199 MOTION for New Trial MOTION to Dismiss filed by Kelly Mala,, 202 MOTION Submitting filed by Kelly Mala, by USA as to Kelly Mala. (Anderson, Scott) (Entered: 11/14/2006) |
| 11/20/2006 | ⊙204 | RESPONSE in Opposition by Kelly Mala, pro-se re 203 Second MOTION to Strike Re: 201 MOTION to Amend/Correct 199 MOTION for New Trial MOTION to Dismiss filed by Kelly Mala, filed by Kelly Mala,, 199 MOTION for New Trial MOTION to Dismiss filed by Kelly Mala,, 202 MOTION Submitting filed by Kelly M filed by USA. (Attachments: # 1 envelope)(np, ) (Entered: 11/21/2006) |
| 11/27/2006 | ⊙206 | MOTION to attach newly information in support of motions filed at dkts #199 and 201 by Kelly Mala, pro se. (ft, ) Additional attachment(s) added on 11/28/2006 (ft, ). (Entered: 11/28/2006) |
| 11/27/2006 | ⊙207 | MOTION to Vacate and Dismiss Indictment Pursuant to Rule 12(b)(2) by Kelly Mala, pro se. Suggestions in opposition/response due by 12/11/2006. (Attachments: # 1 Exhibit A.2# 2 Exhibit From Sea Cats Reports# 3 Envelope)(ft, ) (Entered: 11/28/2006) |
| 11/28/2006 | ⊙210 | RENEWED MOTION to Dismiss the Indictment by Kelly Mala, pro se. Suggestions in opposition/response due by 12/11/2006 (Attachments: # 1 Exhibit # 2 Envelope)(ft, ) (Entered: 11/29/2006) |
| 11/29/2006 | ⊙208 | Third MOTION to Strike Re: 206 MOTION to attach newly information in support of motion filed at dkts #199 and 201 filed by Kelly Mala,, 207 MOTION to Dismiss filed by Kelly Mala, by USA as to Kelly Mala. (Anderson, Scott) (Entered: 11/29/2006) |
| 11/29/2006 | ⊙209 | MEMORANDUM in Support filed by Kelly Mala, Pro Se re 201 MOTION to Amend/Correct 199 MOTION for New Trial MOTION to Dismiss filed by Kelly Mala, filed by Kelly Mala,, 199 MOTION for New Trial MOTION to Dismiss filed by Kelly Mala, (ft, ) (Entere |

FILED

07 0873 MAY - 9 2007

E X H I B I T  **7.**  part 1.

PS 5110.13
12/15/99
Attachment A, Page 1

## INMATE POLYGRAPH AUTHORIZATION

I, _Kelley Malo_ , _01995-094_ , an
  (name)                (reg. no.)

inmate at the _MDC Guaynabo_ authorize the Bureau of
              (institution)

Prisons to permit _JOSE MELENDEZ_ to administer a
                  (name of polygraph co.)

polygraph test to me at _MDC Guaynabo_ on _10/25/05_.
                        (location)        (date)

I understand this is being done in connection with

_Cremin/Core_ explained to me by _JOSE CORDERO_
(name of case/investigation)              (name)

_PORR local Specile._
   (title/position)

    I do this voluntarily, and with no promise of favor or
coercion by the Bureau of Prisons.

_____      _10/25/05_
     (signature)               (date)

07-0873

ACKNOWLEDGEMENT OF OATH

          LOCAL REPRODUCTION AUTHORIZED

**FILED**

MAY - 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

USAM 9-13.000 OBTAINING    VIDENCE                                    Page 2 of 10

E X H I B I T   ● part 2.

is the relevant rule or the interpretation or application of the relevant rule. *See also* the Criminal Resource Manual at 296 through 298

## 9-13.300 Polygraphs -- Department Policy

The Department opposes all attempts by defense counsel to admit polygraph evidence or to have an examiner appointed by the court to conduct a polygraph test. Government attorneys should refrain from seeking the admission of favorable examinations that may have been conducted during the investigatory stage for the following reasons.

Though certain physiological reactions such as a fast heart beat, muscle contraction, and sweaty palms are believed to be associated with deception attempts, they do not, by themselves, indicate deceit. Anger, fear, anxiety, surprise, shame, embarrassment, and resentment can also produce these same physiological reactions. S. Rep. No. 284, 100th Cong., 2d Sess. 3-5 (1988). Moreover, an individual is less likely to produce these physiological reactions if he is assured that the results of the examination will not be disclosed without his approval. Given the present theoretical and practical deficiencies of polygraphs, the government takes the position that polygraph results should not be introduced into evidence at trial. On the other hand, in respect to its use as an investigatory tool, the Department recognizes that in certain situations, as in testing the reliability of an informer, a polygraph can be of some value. Department policy therefore supports the limited use of t he polygraph during investigations. This limited use should be effectuated by using the trained examiners of the federal investigative agencies, primarily the FBI, in accordance with internal procedures formulated by the agencies. *E.g.*, R. Ferguson, Polygraph Policy Model for Law Enforcement, *FBI Law Enforcement Bulletin*, pages 6-20 (June 1987). The case agent or prosecutor should make clear to the possible defendant or witness the limited purpose for which results are used and that the test results will be only one factor in making a prosecutive decision. If the subject is in custody, the test should be preceded by Miranda warnings. Subsequent admissions or confessions will then be admissible if the trial court determines that the statements were voluntary. *Wyrick v. Fields*, 459 U.S. 42 (1982); *Keiper v. Cupp*, 509 F.2d 238 (9th Cir. 1975).

See the Criminal Resource Manual at 259 et seq. for a discussion of case law on polygraph examinations.

## 9-13.400 News Media Subpoenas -- Subpoenas for News Media Telephone Toll Records -- Interrogation, Indictment, or Arrest of Members of the News Media

Procedures and standards regarding the issuance of subpoenas to members of the news media, subpoenas for the telephone toll records of members of the news media, and the interrogation, indictment, or arrest of members of the news media are set forth in 28 C.F.R. § 50.10.

It is the Department's policy to protect freedom of the press, the news gathering function, and news media sources. Therefore, all attorneys contemplating the issuance of such subpoenas, the interrogation of a member of the new media, or the initiation of criminal proceedings against a member of the news media should be aware of the requirements of 28 C.F.R. § 50.10.

Except in cases involving exigent circumstances, such as where immediate action is required to avoid the loss of life or the compromise of a security interest, the express approval of the Attorney General is necessary prior to the interrogation, indictment, or arrest of a member of the news media for an offense which he is suspected of having committed during the course of, or arising out of, the coverage or investigation of a news story, or committed while engaged in the performance of his official

Exh. 

# Forensic Report

## *Polygraph Examination*

*José A. Meléndez Aponte, CFPE*

**CONFIDENTIAL**

***Anita Hill, Esquire***
***Old San Juan, Puerto Rico***

## José A. Meléndez, CFPE _____

*Baldorioty de Castro 711, Suite 202, Hato Rey, P.R.  00918*

### INFORMATIVE STATEMENT
### CASE NUMBER 05-570
### Anita Hill, Esquire

I, José A. Meléndez, Certified Forensic Polygraph Examiner, in my professional character declare as follow in this Polygraph Forensic Report:

**FIRST:**  On October 13, 2005 Mrs. Anita Hill, Esquire, communicated with me to contract my professional services to administer a polygraph examination to Mr. Kelly Mala.

**SECOND:**  On October 24, 2005 the documents regarding the present case were received to analyze and talk about the scope of the examination. The preliminary interview with Mr. Kelly Mala was conducted on October 25, 2005, the same day of his analysis at the Metropolitan Detention Center in Guaynabo, Puerto Rico.

**THIRD:**  <u>Forensic Polygraph Terminology</u> -

a)  **Forensic Polygraph Analysis** - is the scientific study that a polygraph examiner develops over a person subject to this, using a polygraph with the purpose to determine if this person lies or not to the questions offered to him.

b)  **Psycho- physiological Changes** (responses) - are the physiological changes that a human body suffers in the presence of different stimulus, specifically a psychological reaction (p.e. frighten) motivated by a sensorial stimulus (p.e. auditive- a question) it will cause a physiological change (p.e. higher blood pressure).

c)  **Polygraph Examiner** (Polygrapher) - is the qualified professional to administer the polygraph analysis. Generally, this person must have attended an accredited polygraph school in addition to one year under a direct supervision of an expert or under his tuition plus a year under his direct supervision.

**Page - 2 -**
**Informative Statement**
**Case Number 05-570**

d)      **Charts / Polygrams** - are the written diagrams that are developed over a paper in constant movement at the time the exam is given.  They are the same used for the forensic analysis for the purpose of getting an opinion.

e)      **Forensic Opinion** - is the opinion given by the examiner after he has finished the polygraph analysis.  Basically exist three (3) different types of opinion:

1) Deception Indicated - it's when out of the analysis, the charts show psycho-physiological response greater to incriminatories questions (relevants) than to control questions.

2) Non-Deception Indicated - it's when out of the analysis you'll see that psycho-physiological responses have exists greater to control questions than to incriminatories questions (relevants).

3) Non Conclusion - it's when the necessary elements did not come out of the charts to draw a specific opinion.

f)      **Oxygenation Ratio** - are the cycles of inhaling and exhaling oxygen in the lungs.  Although it can be confused with the breathing process easily, this last occurs in a conscious level and the oxygenation process occurs at an unconscious level.

g)      **Polygraph** - scientific instrument designed to monitor and register the development and behavior of some physiological functions of the human being, in which necessarily the pectoral and abdominal oxygenation ratio, the galvanic skin response and pulse / pressure of the cardiovascular system are included.

History (synthesis) - the first scientific instrument designed to register physiological changes with the purpose of "detect lies" in a human being refers to 1871, developed by the "Father of Criminology", the Italian Cesare Lombroso.  He called his instrument "Hydrosphigmograph" and it had the capacity to register periodically (over a roller) changes in the blood pressure and pulse.  Later on, in 1914, another Italian scientist named Vittorio Benussi, led successfully his experiments with the changes that occur   in the

*Page - 3 -*
*Informative Statement*
*Case Number 05-570*

*oxygenation pattern (in pectoral as well as abdominal). His studies concluded that certainly occur particular changes in the oxygenation patterns as indications of lies. This instrument developed for this purpose was called "pneumograph".*

*In 1917, Dr. William Marston used a "sphygmomanometer" to go deeper in Lombroso's studies about the changes that occur in the cardiovascular system during the administration of the analysis. He experimented with the pneumograph and the galvanometer, instrument designed to register changes in the electric conductivity of the skin, which is a dermal property discovered by an Italian scientist named Galvani in 1791.*

*The first instrument called "polygraph" was developed by John Larson in 1921 and he incorporated the pneumograph and the sphygmomanometer in a single instrument, with the capability of register changes in the pulse and cardiovascular pressure in addition to the pattern and volume of oxygenation. Later on, Leonard Keeler incorporated the galvanometer to the Larson's polygraph setting the equipment that founded the instruments used now a day.*

*h)    **Control Questions** - are the questions used to established a comparative analysis with the relevants questions. Basically they involve a "known lie" or assumption of previously facts of the examinee. To be effective, they should be closer within the same category to relevant questions and framed within a specific time.*

*i)    **Irrelevant Questions** - are the questions that, although they don't have apparent importance to the examinee, they create a state of relaxation to the examinee before and after a control or relevant question, developing a normal physiological answer creating a base line for the examiner.*

*j)    **Relevant Questions** - are the questions that try to clear directly the controversy that is the object of the analysis. They are the important questions of the investigation and they must be specific and not compound.*

*k)    **Galvanic Skin Response** - is the reaction of the skin to a little electric shock. It depends on the stress level in which a person gets on a specific moment, the skin will be more conductible or not to a minimum electric flow.*

*Page - 4 -*
*Informative Statement*
*Case Number 05-570*

*l)        **Questions Technique** (Test) - are the different configurations of questions that the examiner sets in respond to the polygraph analysis. They vary according to the information in controversy, purpose of the test, capability of the examiner and the person under analysis.*

*The questions technique plays a very important role with the certainty of a polygraph analysis, while more advanced the question's technique greater certainty of the analysis. Today exists about twelve (12) different polygraph tests. Since the beginning of the century and half of the decade of 1950, the Relevant / Irrelevant Question's Technique was widely used; from 1954, under John Reid's implementation, the control questions rose as the standard.*

*As all scientific methodology, the control questions are designed to evaluate the development of the relevant questions and to establish a comparative analysis. Since then, all the tests configured lately are based on this technique.*

*m)        **Oxygenation Volume** (ratio) - is the amount of oxygen inhaled and exhaled out of the lungs in each oxygen cycle (breathing); or the space occupied by oxygen in the lungs.*

*n)        **Forensic** - word derived from latin word "foros, forensis", and means all the analysis (or sciences) that are going to be evaluated by an audience, judge, etc. All specialized job by which the results of a scientific analysis will be evaluated by a forum.*

**FOURTH:**        <u>Trust and Certainty of the Polygraph Analysis</u>

*When you talk about the certainty or reliability of the polygraph, most people do not know exactly what is it about. It is thought that it is the instrument that says if an individual is telling the truth or not. The instrument is merely a writing instrument of some physiological*

*functions in the human body. When we talk about the reliability of the polygraph, what we are really talking is about if the instrument can be trustfully to register the physiological responses to which the instrument was designed, or specifically its calibration. About that particular (reliability of the polygraph) there is no doubt that the instrument has a certainty of 99.9% (not to say 100%).*

*Page - 5 -*
*Informative Statement*
*Case Number 05-570*

*When we talk about certainty or reliability degree of the **Polygraph-Technique**, we talk about the reliability of the interpretative technique used to submit an opinion about if the examinee is lying or not to a specific line of questions. The degree of reliability or certainty in the interpretation depends greatly of the preparation and experience of the examiner. A good illustrative example that shows about this particular is the radiographic analysis (X-rays). A same radiography can be interpreted by two doctors differently according of the experience and the specialization of them. The radiography doesn't have to deal with the interpretation and conclusion of the doctors, this produces exactly what was "photographed" by the machine during the analysis. The same happen with the polygraph charts, they are an exact reproduction of the events that happen in a human being under analysis. Of all studies carried out during decades at a world level and that we can consider serious, these establish certainty or reliability percentage of the interpretation technique between 85% and a 93%. Other studies give the interpretative technique between 67% and 98%.*

*The actual analysis that this examiner carry on, comply with the highest standards of polygraph analysis in instrumentation, questions techniques, preparation and knowledge of the particular case.*

*I can point that the present polygraph analysis has a certainty degree not less than a 87%.*

**FIFTH:**    *Legal Aspects*

*One of the most relevant opinion was given by the Supreme Court of the United States of America in the case "**William Daubert v. Merrell Dow Pharmaceuticals**" of June 28, 1993. In this case the Supreme Court sustained that are the Federal Rules of Evidence which provide the standards to admit expert scientific testimony in the federal cases and not the Frye case. Considerations:*

*a)    The "general acceptance" established in the Frye case could have been voided by the adoption of the Rule 702 that governs the admission of expert testimony in court. In these there is no indication that general acceptance is a pre-condition for the admission of scientific evidence. Moreover, this rigid standard (Frye standard) is against the liberal spirit of the Rules and its*

*Page - 6 -*
*Informative Statement*
*Case Number 05-570*

*purpose of making this more flexible to traditional boundaries over forensic expert testimony.*

*b)   The Evidence Rules, mainly the 702, establish limits over the admission of scientific evidence, appointing to the Judge in Court the responsibility of being secure that the scientific testimony of the expert lies over a trusted reliable analysis and is pertinent to the case under consideration.   The reliability standard is govern by the same 702 Rule when it says: "If a scientific knowledge, technique or specialized is of help to the jury to understand evidence or determine a fact in controversy, a witness capable as an expert by his knowledge, skill, experience or education could testify giving an opinion or in other way".*

*c)   The pertinent or relevant standard is established in Rule 401 that says: "Pertinent evidence is that one pointing to make the existence of a fact more probable without such evidence.  That fact should refer to a controversy or to the credibility of a witness". This standard about relevance is one of liberal tendency.*

*d)   Rule 402 of the same code establishes: "Except, when other thing is arranged by Law or by these rules, all evidence is admissible.  Non pertinent evidence is not admissible."*

*e)  The cross-examination, the presentation of opposite evidence and the careful instruction to the jury to evaluate the weight of the proof, is*

*f)  The appropriate way in which evidence based in valid principles should be defied instead of making it a "per se" exclusion.*

*The most recent opinion of the Supreme Court of the United Sates regarding the polygraph science it **United States v. Scheffer, 1988 WL 141151 (1998).** On it, the Court ruled the admissibility of polygraph evidence in military criminal proceedings.  The central issue was whether the per se exclusion of polygraph evidence infringed upon a defendant's right to present exculpatory evidence.   In a split decision, the Court ruled that the ban of polygraph evidence in military proceedings was reasonable.*

*Page - 7 -*
*Informative Statement*
*Case Number 05-570*

*In this case, the Supreme Court reversed the United States Court of Appeals for the Armed Services determination that per se evidentiary rules excluding polygraph evidence in criminal proceedings violated a defendant's U.S. Constitutional Sixth Amendment right to present a defense. The direct effect of the Court's decision is to uphold , at least in the face of a Sixth Amendment challenge, a per se rule of evidence, imposed by the appropriate rule-making authority, excluding polygraph evidence in criminal proceedings. The Court does not foreclose the admission of polygraph evidence in those jurisdiction where the rule-making authorities have not imposed a per se rule of exclusion of polygraph evidence.*

*Leaving open the possibility that the Court might consider future cases on this issue, Justice Kennedy wrote: " I doubt, though, that the rule of per se exclusion is wise, and for some later case might present a more compelling case for introduction of the testimony than this one does. Though the considerable discretion to the trial court in admitting or excluding scientific evidence is not a constitutional mandate, see* **Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587 (1993)**, *there is some tension between that rule and our holding today. And, as JUSTICE STEVENS points out, there is much inconsistency between the Government's extensive use of polygraphs to make vital security determinations and the argument it makes here, stressing the inaccuracy of these tests".*

*In beginning his dissenting opinion, Justice Stevens observed that the Court's holding "Rest on a serious under evaluation of the importance of the citizen's constitutional right to present a defense to a criminal charge and an unrealistic appraisal of the importance of the government interest that undergird the Rule. Regarding the reliability of the polygraph, Justice Stevens wrote: "There are a host of studies that place the reliability of polygraph tests at 85% to 90%. While critics of the polygraph argue that accuracy is much lower, even the studies cited by the critics place polygraph accuracy at 70%. Moreover, to the extent that polygraph errs, studies have repeatedly shown that the polygraph is more likely to find innocent people guilty than vice versa. Thus, exculpatory polygraphs -like one in this case- are likely to be more reliable than inculpatory ones". (Footnotes were omitted).*

*With regard to the usurpation of jury function argument, Justice Stevens wrote that the "fear that the average jury is not able to asses the weight of this*

*Page - 8 -*
*Informative Statement*
*Case Number 05-570*

*testimony reflects a distressing lack of confidence in the intelligence of the average American.*

*As observed by the same Justice Stevens, Military Rule 707 "has no counterpart in either the Federal Rules of Evidence or the Federal Rules of Criminal Procedures". Accordingly, until such time, if ever, that a similar rule of evidence is imposed on federal courts, the admissibility of polygraph evidence in federal courts continues to be governed by **Daubert v. Merrell Dow Pharmaceuticals, Inc.** Under Daubert, considerable discretion is placed in the trial court to determine whether to admit or exclude scientific evidence. Similarly, jurisdictions which have adopted rules similar to the federal rules or which follow the test for admitting scientific evidence under Daubert, and whose rule- making authority has not imposed a per se ban of polygraph evidence, are not affected by this opinion.*

*Finally, Justice Stevens conclude that Rule 707 of the Military Code did indeed violate Airman Scheffer's Sixth Amendment Right to present a defense. It is important to recall that Military Rule of Evidence 707 is a presidentially-imposed rule of evidence. It could be subject to rescission or modification at the direction of the President.*

*In conclusion, as indicated by Gordon L. Vaughan, Esquire, General Counsel of the American Polygraph Association, Scheffer's case is not the death for the admission of polygraph evidence in criminal trials. Rather, other than constitutionally upholding rule-making authorities' evidentiary limitations of polygraph evidence in criminal cases, **Scheffer** does not impede and, in some ways, endorses the growing trend of the courts to consider, at the trial court level, the admissibility of polygraph evidence on a case by case basis.*

*José A. Meléndez Aponte, CFPE*

* * * * *

*José A. Meléndez, CFPE* _____

*Baldorioty de Castro 711, Suite 202, Hato Rey, P.R.  00918*

## POLYGRAPH EXAMINATION REPORT
### REPORT NO. 05-570
### *Anita Hill, Esquire*

**EXAMINATION REQUESTED** : *Specific Polygraph Examination*

**ANALYSIS REQUESTED BY** : *Anita Hill, Esquire*
*Tanca 300, Suite 3A*
*Old San Juan, Puerto Rico*

**EXAMINEE** : *Mr. Kelly Mala*

**POLYGRAPH EXAMINER** : *José A. Meléndez Aponte, CFPE*

**DATE OF EXAMINATION** : *Tuesday, October 25, 2005*

### OBJECTIVE OF EXAMINATION

The present polygraph analysis has the purpose of determining if Mr. Kelly Mala tells the truth or not when he affirms that the illegal drug that was found on his vessel on August 11, 2005, doesn't not belong to him and that he did not authorized the federal agents to search the embarkation.

At present, Mr. Mala is accused by the federal government of the illegal smuggling of forty seven kilograms (47 kg.) of a schedule II Narcotic Drug Controlled Substance (cocaine) and one hundred and seventy grams (170grams) of a schedule I Narcotic Drug Controlled Substance (heroin) from U.S. Virgin Islands to Puerto Rico.

*Page - 2 -*
*Case No. 05-570*
*Forensic Report*

## EXAMINEE'S PRE-TEST INTERVIEW

*During the pre-test interview, Mr. Kelly Mala affirms that on August 11, 2005, he departed from St. Thomas at 2:15pm approximately to Fajardo, Puerto Rico, accompanied with other two persons in his pleasure boat, 21 feet long. The reason of the travel was to buy some construction materials and clothes. Due to mechanical problems, he stopped close to Culebra and stayed at the harbor, repairing the boat. At 3:15pm approximately, he departed to Villa Marina in Fajardo, Puerto Rico, when he was stopped by U.S. Customs Border Patrol vessel. The agents asked his destiny and he said Villa Marina in Fajardo. The federal agents asked him to describe the harbor of Villa Marina and he did so. Some gun armed agents jumped to his vessel and asked him aggressively for identification. He gave them his whole wallet.*

*After that, everything happened very fast. One of the agents asked very aggressively in English to the lady, "Where you come from?" twice and she unanswered and was afraid because she doesn't speak English. Agent started searching and said: "All of you are under arrest because a contraband is in a boat". At this point, they haven't found anything illegal. They didn't inspect regulatory equipment and did not ask to search the vessel. Then, they were handcuffed and passed to the patrol vessel and went to Roosevelt Road's harbor. He asked to make a telephone call to a relative or his lawyer but they refused.*

*After a while, the federal agents said that found illegal drug in the vessel. The same was found inside two tool boxes that Mr. Otilio Carrasco (another of the passengers) brought to the vessel. These two toolboxes were supposed to be given to a friend of Carrasco in Fajardo. The examinee denies that he knew about the presence of the illegal drug into his vessel.*

*Regarding the written statement that he wrote admitting his involvement in the drug smuggling, he admits that he refused to sign any paper, but after an hour, he wrote the same after having written some others that did not satisfy the federal agents and were destroyed.*

*Mr. Mala affirms that the final statement was given under threatening and that in the statement of Mr. Cabrera, the same words were used. Examinee strongly repeats that he wrote and signed everything given by the federal agents and not as the facts occurred.*

**Page - 3 -**
**Case No. 05-570**
**Forensic Report**

## RELEVANT QUESTIONS

*After the pre-test interview, the examinee was submitted to the polygraph analysis. The following relevant questions were used.*

I.    *On August 11, 2005, did you give a verbal consent to Customs Officers to search your vessel?*

II.    *On August 11, 2005, do you have any knowledge that the toolboxes contained illegal drugs?*

III.    *Such illegal drugs found in your vessel, belongs to you?*

IV.    *The written statement that you gave to the federal agents, was given voluntarily?*

IVb.    *The written statement that you gave to the federal agents, was given by intimidation?*

V.    *What you said in the written statement, was it the truth that you would be paid $15k for the drugs?*

VI.    *Did you tell the truth in the written statement?*

*During the administered charts, the examinee answered "No" to all the relevant questions identified I, II, III, IV, IVb, V and VI.*

## EXAMINER'S OPINION

*Based on the charts administered by October 25, 2005 on **Mr. Kelly Mala**, it is a qualified opinion of this Examiner that **the examinee Did Not Engage In Deception during the present examination** when he answered "No" to the relevant questions administered.*

*Page - 4 -*
*Case No. 05-570*
*Forensic Report*

This is, **the examinee Kelly Mala is telling the truth when he**:

- *Affirms that he never gave any verbal consent to the federal agents to search his boat;*

- *Affirms that he never knew that the toolboxes belongings to Mr. Otilio Carrasco contained illegal drugs;*

- *Affirms that he was not the owner of the illegal drug occupied on his vessel;*

- *Affirms that the written statement given to the federal agents was not given voluntarily but by intimidation;*

- *Affirms that the $15k that he said would be given to him, was false;*

- *Affirms that he did not tell the truth in the written statement given to the federal agents.*

## EXAMINER'S RECOMMENDATION

It is my professional recommendation to submit Mr. Otilio Carrasco to Polygraph Analysis to corroborate the truth in this case with the Government's Expert itself.



Signed and sealed, November 7, 2005 in San Juan, Puerto Rico.

*José A. Meléndez Aponte, CFPE*

* * *



*José A. Meléndez*, *a Puerto Rico Forensic Sciences Board Examination's Certified Polygraph Examiner, with twenty (20) years of experience and over 9,700 examinations.*

### Government Service

*Special Agent for the Special Investigation Bureau of the Puerto Rico Justice Department (1981-1986).*

*Polygraph Examiner for the Technical Services Division of the Special Investigation Bureau of the Puerto Rico Justice Department (1984-1986).*

*Polygraph Examiner for the Polygraph Section of the Puerto Rico Forensic Science Institute (1986).*

### Private Service

*Polygraph Examiner (part time) for Scientific Polygraph Services in Puerto Rico (1985).*

*Manager of Investigations for Wackenhut of Puerto Rico and Specialized Polygraph Examiner for Wackenhut Corporation, offering services for the United States Embassies in South and Central America and the Caribbean Region (1986-1989).*

*Founder / Associate of Puerto Rico Forensic and Criminalistics Consultants, in charge of the Special Investigations and Polygraph Services (1989-1993).*

*Independent Polygraph Examiner / Consultant since 1989.*

### Academic and Specialized Studies

*Bachelor degree from the University of Puerto Rico in Social Sciences (1984, Cum Laude).*

*Specialized courses in Criminal Investigations, Scientific Interviews and Forensic Polygraph Examinations developed at the Special Investigations Bureau (P.R. Justice Department), National Training Center of New York and Metropolitan Police Institute of Miami, Florida.*

*Page – 2 –*
*Credentials*

**Professional Services Rendered In:**

*Puerto Rico, St. Marteen, Aruba, Curacao, Haiti, Dominican Republic, Cayman Islands, Jamaica, Mexico, El Salvador, Guatemala, Honduras, Belize, Trinidad and Tobago, Barbuda, Costa Rica, Colombia, Ecuador, Peru, Venezuela, Grenada, St. Croix and St. John.*

**Publications**

*Several technical articles of Polygraph Examinations published in the "Criminology and Forensic Sciences Publication of Puerto Rico". Also published in the "Forensic Newscope Publication of Puerto Rico", and "The Forensic Crime and Investigation Manual, 1997".*

**Seminars / Conferences**

*Invited instructor in investigations and criminalistics seminars or conferences dictated to law enforcement personnel (P.R. Police Department, P.R. Justice Department, among others), lawyers (P.R. Association of District Attorneys), judges (P.R. Courts Administrations) and the business concerns.*

**Expert Testimony**

*Testimony expertise at State Courts (Superior / District), Federal Courts (Puerto Rico District / First Circuit of Boston Audience / Martial Courts of the U.S. Armed Forces).*

**Services Offered To**

*Banks, Airlines, Insurance Companies, State (Fiscal Especial Independiente, Senado de P.R., Cámara de Representantes y Senado de P.R.) and Federal Government Agencies (DEA, Secret Service, Customs, Federal Public Defender, Coast Guard, State Department), Law Firms, Independent Attorneys (P.R. and U.S.) and many others retail businesses.*

**Professional Awards**

*"Forensic Investigator of the Year 1987" (as Polygraph Examiner), Puerto Rico Forensic Sciences Association.*

\* \* \*

statement inadmissible because it was obtained in violation of defendant's Sixth Amendment right to counsel.

**WHEREFORE** it is respectfully requested from this Hon. Court that it schedule a hearing in this case and that it find that defendant Mala's confession was involuntary, untrustworthy, false and obtained in violation of his Sixth Amendment right to counsel and prohibit any use of said statement at trial.

**RESPECTFULLY REQUESTED.**

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: AUSA Scott Anderson.

San Juan, Puerto Rico, this 14th day of November, 2005.

s/ *Anita Hill*

**ANITA HILL**
**USDC-PR-209007**
Attorney for defendant
P O Box 9023272
San Juan PR 00902-3272
(787) 724-2470
Fax (787) 724-2480
anitahill@prtc.net

## STATEMENT UNDER PENALTY OF PERJURY

I, Kelly Mala, under penalty of perjury state that the above facts are true.

November __17__ , 2005

KELLY MALA

U.S. Department of Justice

Executive Office for United States Attorneys
Freedom of Information/Privacy Act Staff
600 E Street, N.W., Room 7300
Washington, D.C. 20530
202-616-6757  Fax 202-616-6478

Request Number: 06-3253          Requester: Kelley Mala

Subject: AUSA Scott Anderson (Oath of Ofc.)/DPR

    The Executive Office for United States Attorneys (EOUSA) has received your Freedom of Information Act/Privacy Act (FOIA/PA) request. It has been assigned the above number. Please give us this number if you write about your request. If we need additional information, we will contact you within two weeks.

    Your request will be placed in the order in which it was received for processing, unless it is a very large request (Project Request). Then, it will be placed in a separate group of Project Requests, which are also processed in the order received.

    EOUSA makes every effort to process most requests within a month (20 working days). There are some exceptions, for example, Project Requests take approximately nine months to process. Requests for "all information about myself in criminal case files" are usually Project Requests. If you have made such a request, you may either write us and narrow your request for specific items, or you may expect that the processing of your request may take nine months from the date of this letter.

    By making a FOIA/PA request, you have agreed to pay fees up to $25, as stated in 28 CFR § 16.3(c), unless you have requested a fee waiver. Please note that pursuant to 28 CFR § 16.11, we are required to charge fees for time used to search for the documents you have requested and for duplication of all pages released to you. Normally, search time is charged at a rate of $28 per hour after the first two hours which are free, and duplication fees are $0.10 per page after the first 100 pages which are free. Please do not send any payment at this time! If we anticipate that fees will exceed $25 or the amount you have stated in your letter (if greater than $25), we will normally notify you of our estimate of fees. After we have received your agreement to pay for the expected fees (or you have narrowed your request to reduce fees) and we have processed your request, we will require payment for the accumulated charges before we release documents to you. Without such payment, your request file will be closed without further action.

    Sincerely,

    William G. Stewart

    William G. Stewart II
    Acting Assistant Director

                      Form No. 001 -1/06

delegated to particular United States Attorneys' offices (USAOs) to the extent that such a delegation will promote the effective accomplishment of the mission of the USAO. Specific delegations will be in writing, and are subject to modification or revocation as necessary.

**B.  Oath of Office.** All employees are required to execute an oath of office (Appointment Affidavit, SF-61) upon appointment (*see* 5 U.S.C. §§ 2903, 3331). The Director, EOUSA, is authorized to administer personally and to delegate authority to administer the oath of office. United States Attorneys and the Assistant Director, Personnel Staff, are delegated such authority by the Director, EOUSA. Any redelegation of this authority must be in writing.

## 3-4.273 Personnel Management Evaluation

Other reference(s): 28 C.F.R. § 0.22

Personnel management evaluations will be conducted on a regular basis for districts with specific written delegations of personnel authority from the Executive Office for United States Attorneys. The purpose of these evaluations is to: assess and analyze the effectiveness of the personnel management program in the United States Attorney's office; assist in identification and resolution of personnel management problems; assess compliance with governing laws, regulations and policies; and analyze the overall organizational effectiveness of the personnel management program of the office. Recommendations on methods to resolve any problems identified during the review will be rendered by an evaluation team charged with the responsibility for conducting the review.

## 3-4.274 Corrective Actions

Other reference(s): None

United States Attorneys' offices (USAOs) which have been delegated personnel authority are responsible for taking all appropriate corrective actions to ensure personnel actions processed fully comply with applicable guidelines. Failure by a USAO to take such corrective actions may serve as a basis for withdrawal or suspension of delegated personnel authority in accordance with USAM 3-4.250.

## 3-4.293 Personnel Records

Other reference(s): APHIs/Personnel/Chapter 293 #s 1 & 2; OPM Operating Manual - Guide to Processing Personnel Actions; OPM Operating Manual - Guide to Personnel Recordkeeping; 5 C.F.R., Part 293

Official personnel files will be maintained by the Personnel Staff, Executive Office for United States Attorneys (EOUSA), or by the United States Attorney's office with authority delegated by EOUSA.

## 3-4.294 Availability of Official Information

Other reference(s): 5 C.F.R., Part 294; 28 C.F.R. § 16

Requests for disclosure of personnel information are to be forwarded to the Personnel Staff, Executive Office for United States Attorneys (EOUSA), or to the United States Attorney's office if it has been delegated personnel authority by EOUSA.